[Civ. No. 30969.   Second Dist., Div. Four.   Mar. 6, 1968.]

BLOOD SERVICE PLAN INSURANCE COMPANY, Plaintiff and Appellant, v. RICHARD S. L. RODDIS, as Insurance Commissioner, etc., Defendant and Respondent.

Lewis, Roca, Scoville, Beauchamp & Linton, Paul M. Roca, John P. Frank, Luckham, Fenton & Lieber, Donald R. Luckham, Selvin & Cohen, and Paul P. Selvin for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, David M. Rothman and Leonard Goldstein, Deputy Attorneys General, for Defendant and Respondent.

Thomas C. Lynch, Attorney General, Jan Stevens, Deputy Attorney General, Long & Levit, Bert W. Levit and Gerald Z. Marer as Amici Curiae on behalf of Defendant and Respondent.

JEFFERSON, J.—This appeal is from a judgment of the superior court which denied the petition for writ of mandate of Blood Service Plan Insurance Company (hereafter BSPIC) brought against the Insurance Commissioner of the State of California. The petition prayed that the insurance commissioner be commanded to issue BSPIC a certificate of

authority permitting it to transact its disability insurance business in California.

These background facts set out in the petition are not disputed. BSPIC is an Arizona corporation, engaged in the disability insurance business, writing indemnity insurance against blood transfusion costs and expenses. Although it is a wholly-owned subsidiary of Southwest Blood Banks, Inc., which is a nation-wide medically sponsored nonprofit blood banking organization, BSPIC is a pure insurance company. Its insurance plan calls for an annual premium of $2.50 for an individual or $5 for a family.[1] The price may be paid either in cash or through a donation of one pint of blood to a cooperating blood bank (which in turn pays BSPIC the cash premium). In return for this premium the insured is reimbursed for any costs and expenses relating to blood transfusions (with certain conditions being excepted) incurred during the policy period. BSPIC has been admitted to do business in 40 states.[2]

The mandamus proceeding was instituted after the insurance commissioner denied BSPIC's application for admission. The denial followed a hearing called to consider four "special issues" raised by the commissioner. Appearing as *amicus curiae* at the hearing to object to BSPIC's application, were the State Department of Public Health and nine of the twelve medically sponsored nonprofit community blood banks operating in California. The four issues raised were directed to the possible adverse effect that the selling of this type of insurance in the state would have on community blood bank operations and on the quantity, quality and cost of blood they supply.[3]

The hearing officer assigned by the insurance commissioner

---

[1] The rates are now $5 and $7.50.

[2] During the pendency of this appeal BSPIC was admitted in five more states, bringing the total to 45 states.

[3] The issues were stated as follows:

"(1) Will blood insurance, if widely accepted, curtail voluntary blood donations because of said programs dependence upon paid donors as their main source of supply?;

"(2) Will the substitution of a paid donor system for a voluntary donor system tend to have a deleterious effect upon the quality of blood so supplied?;

"(3) Should the community need for blood increase while the voluntary donor recruitment system deteriorates, will the cost of blood itself increase through operation of the economic law of supply and demand?; and

"(4) Will blood insurance programs cause unnecessary competition among blood banks which are designed to render a community service?"

to conduct the hearing added to these issues what he termed the ''overall issue,'' to-wit:

''Will the operations of Respondent, if admitted, necessarily have a tendency to curtail or diminish the available blood supply or to undermine the quality thereof to such an extent that such diminution or such inferiority may be held to be the imposition of a condition such as to warrant Respondent's transaction of business in California hazardous to policyholders or to the general public?''

Upon the presentation of evidence, and over the continuing objection of BSPIC that the issues being explored were irrelevant to the matter of its application for admission, the hearing officer answered each of the inquiries in the affirmative and rendered his proposed decision that the application be denied. The insurance commissioner adopted the proposed decision.

Seeking review of the commissioner's decision, BSPIC filed its petition for writ of mandate in the superior court. It urged two basic contentions: (1) That the ''inquiries'' were irrelevant; (2) that the evidence did not support the commissioner's conclusions with respect to them. In its memorandum opinion, the court found against BSPIC on both contentions and denied the peremptory writ.

The case was heard on the record of the proceedings before the commissioner with no additional evidence being introduced. As they did before the commissioner, the State Department of Public Health and the nine community blood banks appeared *amicus curiae* to support the commissioner's action. In support of the judgment on this appeal, they have filed briefs in the same capacity.

No one challenges the fact that BSPIC proved before the insurance commissioner that it has all of the general qualifications of financial responsibility, sound management, integrity and stability required of an insurance company in this state. The rejection of its application was solely on the basis of the findings as to the ''special issues,'' relating to the possible side effects which could occur from making available this type of insurance. The insurance commissioner determined that the operation of the insurance company would adversely affect both existing arrangements for supplying blood and existing suppliers of it; that this would create a hazard to the public.

Did the commissioner have the authority to consider these questions and to base the denial of a certificate of authority on his findings in regard to them?

It must be recognized at the outset that the insurance commissioner is a creature of statute with only the powers delineated therein. The Insurance Code sets out what is to be considered by the commissioner in reviewing an application for admission. (§ 700 et seq.) There is nothing in the statute dealing directly with the admission of insurance companies which would extend the authority to the commissioner to deny a certificate of authority on the grounds given here. As indicated above, it is conceded BSPIC fully satisfies the financial and managerial standards fixed by statute.

The position of the respondent commissioner, adopted by the trial court, is that the denial of the license is authorized under a conservatorship provision of the Insurance Code, section 1011, subdivision (d). The theory argued is that where grounds exist to institute conservatorship proceedings, the commissioner may deny a license *ab initio* because he should not be required to perform an idle act.

Section 1011 of the Insurance Code authorizes the taking over of an insurance company's affairs, through the appointment of the commissioner as its conservator, under special circumstances. Where any one of a number of enumerated "conditions" are found by the commissioner to exist, institution of a conservatorship is permitted. Relied on by the commissioner to deny the license of BSPIC, is the condition which reads: "(d) That such person is found, after an examination, to be in such condition that its further transaction of business will be hazardous to its policyholders, or creditors, or to the public."

It is asserted that, under this provision, the commissioner may consider general questions relating to the public health and welfare in considering an application for a certificate of authority; where it is found that the "transaction of business will be hazardous," this is a ground for denying admission.

But section 1011, subdivision (d), by its plain language, refers to the condition of the company itself, not to the effect of its operation. It recites that if after "examination" it is found that the company's *condition* is "hazardous" or unsafe, than a conservator may be appointed to protect its policyholders, creditors and the public in general.

In the decisions of the courts which have discussed the conservator statute, the grounds for conservatorship have been matters involving loss or risk of loss to policyholders, potential policyholders or creditors of an insurance company; matters such as financial difficulties or unsafe management.

(See *Carpenter* v. *Pacific Mut. Life Ins. Co.,* 10 Cal.2d 307, 329-330 [74 P.2d 761]; *Rhode Island Ins. Co.* v. *Downey,* 95 Cal.App.2d 220, 232 [212 P.2d 965]; *Caminetti* v. *Imperial Mut. Life Ins. Co.,* 59 Cal.App.2d 476, 485 [39 P.2d 681]; *Financial Indem. Co.* v. *Superior Court,* 45 Cal.2d 395, 400-402 [289 P.2d 233].) "Sections 1010 et seq. of the Insurance Code deal with rehabilitation and liquidation of insurance companies in financial difficulties, and with the reinsurance of their business. . . . Section 1011 provides for the filing by the commissioner of a petition for appointment as conservator whenever, among other things, it is disclosed after examination that the company is in such a condition that its further transaction of business would be hazardous to its policyholders, or creditors, or to the public. . . ." (*Carpenter* v. *Pacific Mut. Life Ins. Co., supra,* 10 Cal.2d 307, 329-330.) "As we understand the definition of the word 'hazardous' as used in the statute [section 1011, subd. (d)], it means that the management of the insurance company so conducts its business that there is a loss or risk of loss to the policyholders." (*Caminetti* v. *Imperial Mut. Life Ins. Co., supra,* 59 Cal.App. 2d 476, 485.)

Interpreting a nearly identical conservatorship provision in a New York statute, the court in *In re Bohlinger* (1953) 305 N.Y. 258 [112 N.E.2d 280], concluded (at p. 280): "[T]he term 'hazardous' contrary to the assertion of the Superintendent of Insurance, encompasses only dangers financial in nature."

No authority is cited by respondent which supports any other interpretation. At the trial the commissioner relied heavily on the decision of the insurance commissioner in the state of Florida denying BSPIC a license to engage in business there. The denial (as in the instant case) was based on the anticipated side effects of its operation. That decision was reversed by the Florida Court of Appeals during the pendency of this appeal, the court holding that the commissioner exceeded his authority, and BSPIC has now been admitted in Florida. (See *Blood Service Plan Ins. Co.* v. *Williams* (Fla. App. 1966) 186 So.2d 33.)

The qualifications for the admission of an insurance company are now comprehensively treated and set out in section 717, which was added to the Insurance Code by the Legislature in 1965. Although it was enacted subsequent to the administrative proceedings before the commissioner, and therefore has no direct application to this case, the section is

relevant to the extent that it tends to confirm our interpretation of the law as it then stood.

Section 717 reads as follows: "Before granting a certificate of authority or amended certificate of authority to any applicant, the commissioner shall consider the qualifications of said applicant in respect to the following subjects: (a) capital and surplus; (b) lawfulness and quality of investments; (c) financial stability; (d) reinsurance arrangements; (e) competency, character, and integrity of management; (f) ownership and control of issued and outstanding shares in the case of a capital stock insurer; (g) whether claims under policies are promptly and fairly adjusted and are promptly and fully paid in accordance with law and the terms of policies; (h) fairness and honesty of methods of doing business; (i) method by which said applicant was promoted if any of its promoters remain as stockholders or in management; and (j) hazard to policyholders or creditors.

"Upon consideration of all relevant qualifications the commissioner shall issue a certificate of authority to such applicant, unless the commissioner shall have made a finding, or findings, that the applicant is materially deficient in respect to one or more of the items as outlined in (a) through (j), above."

Item (j), the last enumerated subject for consideration mentioned in section 717 set out above, refers to "hazard to policyholders or creditors." While it picks up some of the language of section 1011, subdivision (d), missing is the relied on reference to "the public."

Section 717 provides that "the commissioner shall issue a certificate of authority" where the applicant insurance company is not "materially deficient" in respect to any of the enumerated qualifications. ▇ Although no such express direction is found under the sections applicable here, section 700 does provide that no insurance company shall conduct any business in this state without having first complied with all of the provisions of our laws. This in effect means ". . . that any company which complies with all the provisions of the laws of the state shall be entitled to a certificate of authority to do business in the state." (*Commercial Union Assur. Co.* v. *Wolf*, 8 Cal.App. 413, 418 [97 P. 79].)

▇ Respondent has not pointed to any statute or regulation or public policy of the State of California which BSPIC would violate by doing business as is proposed. We conclude that the Legislature has not given the insurance commissioner

the power claimed. It follows that respondent abused his discretion in denying the certificate of authority.

The judgment is reversed with directions to the trial court to issue the writ of mandate prayed for.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied March 25, 1968, and respondent's petition for a hearing by the Supreme Court was denied May 1, 1968. Mosk, J., did not participate therein.