[Civ. No. 55067. Second Dist., Div. Four. Feb. 21, 1980.]

COLDWELL BANKER & COMPANY et al., Plaintiffs and Respondents, v.
DEPARTMENT OF INSURANCE et al., Defendants and Appellants.

382

COUNSEL

George Deukmejian, Attorney General, Arthur C. de Goede, Assistant Attorney General, and Susan E. Henrichsen, Deputy Attorney General, for Defendants and Appellants.

Adams, Duque & Hazeltine, John H. Brinsley, Jeffrey P. Smith, Bell, Boyd, Lloyd, Haddad & Burns, John C. Christie, Jr., James I. Serota, Lucinda O. McConathy, Orrick, Herrington, Rowley & Sutcliffe, James H. Benney, John F. Seegal, Levinson & Lieberman, Burton S. Levinson, Lawrence R. Lieberman and Christopher J. Tesar as Amici Curiae on behalf of Defendants and Appellants.

Tuohey, Barton & McDermott, Conrad G. Tuohey, Gibson, Dunn & Crutcher, John J. Hanson, Robert H. Fairbank and Stanley M. Gordon for Plaintiffs and Respondents.

OPINION

**JEFFERSON (Bernard), J.**—Petitioners Coldwell Banker & Company, a California corporation, and Guardian Title Company, a California

corporation, sought a writ of mandate and declaratory relief to compel the respondents, the Department of Insurance of the State of California and Wesley J. Kinder, Insurance Commissioner, to issue to Guardian Title an organizational permit (a permit to sell stock) and a license to do business. The permit and the license would enable Guardian Title to conduct business as an underwritten title company.[1]

## I

### The Factual Background and Procedural History

We set forth the facts and procedural history relevant to this dispute. On May 16, 1975, Coldwell Banker, a real estate broker, caused the formation and incorporation of Guardian Title to conduct the business of an underwritten title company as defined in section 12340.5 of the Insurance Code.[2]

On June 4, 1975, Guardian Title submitted to the Department of Insurance applications for an organizational permit[3] and for a license.[4] Specifically, Guardian Title sought authorization to sell and issue 4,000 shares of its $50 par value common stock at a price of $50 per share to Coldwell Banker; it was contemplated that Coldwell Banker would be the sole shareholder. The license application, as it was originally submitted, proposed that Guardian Title engage in the underwritten title business in 19 California counties.

On January 12, 1976, petitioner Guardian Title filed formal amendments to both applications, requesting authorization to do business in

---

[1]In our discussion, petitioners will sometimes be referred to as Coldwell Banker and Guardian Title; respondents will sometimes be referred to as the department and the commissioner. All references to code sections will refer to the Insurance Code, unless otherwise indicated.

[2]"Underwritten title company" is defined therein as "any corporation engaged in the business of preparing title searches, title examinations, title reports, certificates or abstracts of title upon the basis of which a title insurer writes title policies."

[3]Insurance Code section 827 requires the issuance of a permit by providing: "An insurer shall not sell in this state,...or offer for sale, negotiate for the sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do."

[4]The license requirement is set forth in Insurance Code section 12389, subdivision (a)(3), which provides, in part pertinent to the issue before us: "Such an underwritten title company shall obtain from the commissioner a license to transact its business. Such license shall not be granted until the applicant conforms to the requirements of this section and all other provisions of this code specifically applicable to applicant."

only the four counties of Los Angeles, Ventura, Orange and San Diego; in addition, Guardian Title then proposed to issue 7,000 shares of common stock to Coldwell Banker alone. The Department of Insurance was also informed of Guardian Title's intention to enter into an underwriting title agreement with Security Title Insurance Company, a California corporation and a wholly owned subsidiary of Safeco Insurance Company, engaged in the business of issuing title insurance policies.

Despite numerous requests, both telephonic and written, the department failed to act upon the application for the stock permit; it also failed to issue the license, taking the position that the authorization to sell stock was a condition precedent to the department's consideration of the license application. On January 30, 1976, Guardian Title made formal demand on the department for the approval of both applications.

On March 3, 1976, Coldwell Banker and Guardian Title filed a petition for a writ of mandate and declaratory relief in the Superior Court of Orange County. The department and the commissioner appeared and made a motion for change of venue to the Superior Court of Los Angeles County; the motion was granted. At this point the department and the commissioner advised Coldwell Banker and Guardian Title of the fact that an administrative hearing would be conducted concerning the applications. It was stated that the hearing would be held pursuant to Insurance Code section 12924[5] and that the principal issues for determination were to be the proper interpretation and application of Insurance Code sections 839 and 839.1 to the applications of Guardian Title.[6]

---

[5]This section confers broad investigative powers on the commissioner, enabling the production of evidence "on any subject touching insurance business."

[6]Insurance Code section 839 provides: "The commissioner shall issue a [stock] permit if he finds that: [¶] (a) The proposed plan of business of the applicant and the proposed issuance of securities are fair, just, and equitable. [¶] (b) The applicant intends fairly and honestly to transact its business, and [¶] (c) The securities the applicant proposes to issue and the methods to be used by it in issuing or disposing of them are such as, in his opinion, will not work a fraud upon the purchaser thereof, or upon policyholders or other security holders of applicant. [¶] Otherwise, he shall deny the application and notify the applicant in writing of his decision."

Insurance Code section 839.1 provides: "(a) In any case where a domestic insurer is directly affected by the total transaction for some part of which the permit applied for is needed, and the commissioner in his discretion determines that reasonable grounds exist for contentions that such total transaction or any part thereof: [¶] (1) Is a combi-

From May 12, 1976, through May 24, 1976, the department conducted hearings periodically on this matter.[7] As constituted, the hearings were concerned with the economic effect of permitting real estate brokers, through wholly owned subsidiary title companies (this being the relationship between Coldwell Banker and Guardian Title), to enter the title underwriting business, with particular emphasis on the impact such entries into the title underwriting business would have upon competition. The Department of Insurance hearing officer noted that, in addition to the Coldwell Banker-Guardian Title applications, there were 10 other similar applications under review by the department.

Seventeen witnesses testified. Two expert economists, familiar with the title insurance business, were presented; they were Dr. Irving H. Plotkin, senior economist for Arthur D. Little, Inc., appearing on behalf of California Land Title Association, and Dr. Alfred E. Hofflander, professor of finance and insurance, U.C.L.A. graduate school of management, appearing on behalf of Transamerica Title Insurance Company. Guardian Title and Coldwell Banker attended these hearings and were represented by counsel, who had the opportunity to present such evidence as they wished, and the opportunity to cross-examine all witnesses who testified. They did present the testimony of Guardian Title president Charles R. Hilton; the 1974 annual report of Coldwell Banker was received in evidence.

*Plotkin* testified that he had been gathering statistical data for the preceding five years in an attempt to determine the impact on the industry by the entrance into the market of broker-controlled

---

nation of capital, skill, or acts to create or carry out restrictions on or to prevent competition in the insurance business; or [¶] (2) Is a combination (in the form of a trust or otherwise) in restraint of the insurance business; or [¶] (3) Is an attempt to monopolize the insurance business; or [¶] (4) Is a conspiracy to create any of the foregoing; or [¶] (5) That such total transaction, or any part thereof, if consummated will create or result in any of the foregoing or will substantially lessen competition in the insurance business. [¶] Then, in such event, the Insurance Commissioner may make findings with respect to whether such total transaction, or any part thereof, would or would not do or be any of the foregoing. [¶] (b) In the event the Insurance Commissioner makes affirmative findings as provided in subdivision (a) of this section, he may deny the permit applied for."

[7]The administrative record, consisting of 4 volumes of reporter's transcript and 65 exhibits, was lodged in the superior court file as an exhibit. This record is before us and we have reviewed it.

underwritten title companies. He asserted that "a decision made here, which can be shown to be not in the long run best interests of the consumer, will have a fairly direct and immediate impact on the availability of the states to defend their regulatory system." He noted that the outstanding characteristic of the industry is the fact that the real estate broker controls the placement of title insurance in almost every property transfer transaction. He characterized the industry as an "oligopoly."[8]

Plotkin found that the *average* profit annually was 7.4 percent, although it was extremely volatile, ranging from 2 to 15 percent in any given year. The profit realized was below the ordinary rate of business return. He stated that an operation characterized by high fixed costs —such as the title industry—assigns a great deal of value to every marginal bit of business. He emphasized that a sure source of supply of business is extremely valuable in such an industry. Analyzing the financial data submitted by Guardian Title in connection with its application, Plotkin thought the rate of return (profit) expected was abnormally high, based as it was on significantly lower expenditures by Guardian Title. He made reference to the experience in northern California where entrants to the market that were broker-controlled not only garnered an astonishing percentage of the business from the very beginning, but continued to grow at the expense of the independent title companies who could statistically chart the fact that they were losing ground by the month. The primary example of this phenomena was a group called Founders, broker-controlled and operating in counties of northern California.

*Hofflander*, who testified at the administrative hearing, was the coauthor of a report entitled "The Distribution of Title Insurance in California," March 1976. He agreed with Plotkin that the main characteristic of the industry is broker control of the basic real estate transaction. He found an analogy in the sale of credit life insurance and concluded that, as in that industry, broker-controlled underwritten title companies would eventually drive prices up while decreasing the quality of the product, i.e., title insurance. He was opposed to the licensing of Guardian Title—not only for the anticompetitive impact generated by

---

[8]Webster's Third International Dictionary, 1966 unabridged edition, defines "oligopoly" as "a market situation in which each of a limited number of producers is strong enough to influence the market but not strong enough to disregard the reaction of his competitors...."

any broker-controlled underwritten title companies—but because his analysis of Guardian Title's financial data, submitted with the application, led him to the conclusion that Guardian Title had been set up primarily as a conduit between Safeco Insurance Company and Coldwell Banker to enable Safeco to pay rebates for insurance business in violation of Insurance Code section 12404. Evidence supporting this view was contained in the underwriting contract between Guardian Title and Safeco, which disclosed that Guardian Title would be collecting fees in some situations without doing any work and would be collecting fees the rest of the time for performing very little work.

From such evidence the Insurance Commissioner could reasonably conclude that a license to Guardian Title would provide the opportunity to Safeco Insurance Company to offer rebates to Coldwell Banker, funneled through Guardian Title, in return for Coldwell Banker's sending all of its title insurance business to Safeco.

Findings of fact and conclusions of law were made and issued by the department hearing officer on August 16, 1976. The findings tell us that Coldwell Banker was not only a real estate broker, but, through its subsidiaries, was engaged in all facets of real estate and related endeavors.[9] Particular emphasis was placed upon Coldwell Banker's relationship with its wholly owned subsidiary, Landmark Escrow Services, Inc., which derived 100 percent of its business from Coldwell Banker and whose escrow charges to customers were 150 percent higher than those of other escrow companies operating in the same area. The department concluded that Coldwell Banker, as a real estate broker, would strive to direct title business to Guardian Title in the same manner as it directed to Landmark Escrow the handling of escrows which are necessary for the consummation of real estate transactions.

Finding No. 8 declared that, "[w]ith rare exception, buyers and sellers of residential property either express no preference or look to the real estate broker or salesman (real estate producer) for advice in choosing an escrow holder, a title insurer or other supplier of services ancillary to the transfer of real property. Accordingly, the real estate producer not only has the potential to control, but generally does control, the placement of orders for such ancillary services, . . ."

---

[9]Those subsidiaries mentioned were Forest E. Olson, Inc., Landmark Escrow Services, Inc., Certified Mortgage Company, Inc., Coldwell Banker Management Corporation and Insurance West Corporation.

It was found that competitive efforts by the title companies are ordinarily directed toward the real estate broker rather than the ultimate seller and purchaser, the consumers, and that the broker involved may select the entities to perform the ancillary functions for reasons other than the welfare of the consumer—a phenomenon known as "reverse competition." There was a strong inference that petitioner Coldwell Banker, as a real estate broker, would be in a position to steer its customers needing ancillary real estate services in the direction of the providers of such services selected by Coldwell Banker.[10]

It was revealed that 20 title insurers currently held certificates of authority in California to issue title insurance policies, and that 14 of this group utilized underwritten title companies in the process. One hundred and twelve underwritten title companies were currently licensed in California, many of which also offered escrow services.[11]

The department made an analysis of the economic factors present in the title underwriting business with particular reference to the situation of Guardian Title. In most counties in California, recordings of land transactions are maintained on a grantor-grantee listing basis. A "title plant" of a private corporation is essentially a duplicate of county land records, but reorganized to indicate relevant data on a geographic or parcel-by-parcel basis. Most of the underwritten title companies (90 percent) either own their own title plant or pay a fixed share of the cost of maintaining a jointly owned title plant. The remainder either use county records, have access to a title plant, or have a "search package" arrangement whereby the requisite information is secured by others. Particularly in densely populated areas, the task of creating, maintaining and using a title plant is costly and time-consuming. Since entry into the title insurance business is dependent upon such an expense, success depends upon the ability to attract a substantial volume of business in a reasonably short period of time.

Obviously, an entrant such as Guardian Title, assured from the outset of referrals from the real estate broker, Coldwell Banker, would

---

[10]An analogy was found in the sale of credit life and disability insurance, where the demand is "derived" in the sense that it would not exist except for the underlying transaction, and the cost represents a small percentage (one-half of 1 percent) of the total transaction price. (See *Credit Ins. Gen. Agents Assn. v. Payne* (1976) 16 Cal.3d 651 [128 Cal.Rptr. 881, 547 P.2d 993].)

[11]It was noted that Guardian Title had no intention of offering escrow services, because of the existence of Coldwell Banker's wholly owned escrow service corporation, Landmark.

have a substantial economic advantage over those title companies without a ready-made source of business. Guardian Title, the findings stated, due to its contract with Security Title and Insurance Company, would have the additional advantage of not being required to make other than a minimal capital investment in title plant acquisition or maintenance in the four counties in which it proposed to do business, since Security would, pursuant to the agreement, provide Guardian Title with plant access in Los Angeles and Orange Counties, and with a search package in San Diego and Ventura Counties (the result in the latter counties being that Guardian Title would have almost nothing to do in those two counties).

The findings from the administrative hearings set forth that dramatic growth in the real estate market has enabled some of the new underwritten title companies to compete successfully with existing companies, but foresaw that "[f]oreclosure of the market or an appreciable part of the market to entrants by tie-in sales or comparable arrangements, could pose an insurmountable barrier to entry...." The Coldwell Banker-Guardian Title arrangement was seen as a potential threat in the future because potential new entrants without a ready-made source of business might well decide not to enter the market for fear of being at a competitive disadvantage that could not be overcome, even by "offering lower prices, better coverage, or higher quality service."

The Department of Insurance determined that the proliferation of broker-owned underwritten title companies would result eventually in diminishing competition and lack of incentive to lower prices. Since the margin of profit in the business is small, the market volatile, and fixed expenses very high, there would be continuous pressure to increase the cost of services to the consumer.

It was further found that, although "relatively few" underwritten title companies were presently owned or controlled by real estate producers, the evidence showed that those that were so owned or controlled, "have generally enjoyed success in terms of market penetration and profitability that is unmatched by [their competitors]. No reason has been shown for the extraordinary success of such underwritten title companies other than their ownership or control by real estate producers."[12]

---

[12]The evidence upon which the department relied in making this finding concerned experience in northern California rather than any figures relative to market share, market penetration or growth of realtor-owned underwritten title companies in the four

Another significant finding was finding No. 29, to the effect that the licensing of Guardian Title would "serve as a significant deterrent to entry and, therefore, would serve to substantially lessen competition in the title insurance business."

Therefore, the conclusion was reached that Guardian Title was not entitled to a stock permit because it would be in violation of Insurance Code sections 839, subdivision (b), and 839.1, subdivision (a)(5). We need not consider the applicability of Insurance Code section 839—the general section—because the record demonstrates that the permit was properly denied under the more specific provisions of Insurance Code section 839.1. Other findings and conclusions concerned the illegality per se of the Guardian Title-Coldwell Banker arrangement as a form of "tie-in sale," the possible violation of Insurance Code sections 12404 and 12412, which prohibit rebates, and the inapplicability of Insurance Code section 790 et seq., which enumerate certain unfair business practices by insurers.

With respect to the language of Insurance Code section 839.1, the department declared that "every domestic insurer" would be "directly affected by the total transaction [in which Guardian Title would be engaged] to the extent that the granting of this permit...portends the end of competition as it is presently known in the title insurance industry in California,...." And, it was concluded, that "[t]he provisions of § 839.1, although patterned after the [federal] Clayton Act and in part the regulations of the Federal Trade Commission, are unique to the Insurance Code in California law. The Legislature clearly intended the section to be applied prospectively to enable the Commissioner to deny securities permits to insurers, foreign and domestic, in any situation where the Commissioner finds that the total transaction, or any part thereof for which a securities permit is required, will result in any of the anti-trust type violations enumerated in the section."

With the exception of two findings immaterial here, the department's findings and conclusions were adopted by the commissioner, and, on October 27, 1976, the application of petitioners for a stock permit was formally denied upon the grounds that issuance would violate Insurance Code sections 839, subdivision (b), and 839.1, subdivision (a)(5).

---

southern California counties in which Guardian Title proposed to operate. The northern California experience, however, led the department to conclude that the market share of wholly owned underwritten title companies would be closely aligned to the share of the market controlled by the parent.

Coldwell Banker and Guardian Title then resumed litigation in the superior court, filing a second supplemental and amended petition for mandate and declaratory relief. In it they alleged that, pursuant to the Insurance Code, the issuance of the permit and the license were ministerial rather than discretionary duties of the respondents Department of Insurance and the commissioner; but that if discretion could be exercised by respondents in connection with issuance, it had been abused; and that denial of the applications constituted a denial of due process and equal protection of the laws. The matter came to trial in 1977.

## II

### *The Findings, Conclusions and Judgment of the Trial Court*

As a preliminary matter, all the parties to the litigation agreed that the petition for mandate was sought pursuant to Code of Civil Procedure section 1085.[13] Coldwell Banker and Guardian Title again offered the testimony of Charles R. Hilton, a California attorney, who identified himself as an employee of Coldwell Banker and president of Guardian Title. Hilton testified that the percentage of the real estate market enjoyed by Coldwell Banker in the four California counties in which Guardian Title wished to do business constituted 2 percent of the total market, and that Coldwell Banker was able to influence the choice of title insurance companies by its customers in about 50 percent of the sales consummated, with the result that the title insurance business which would flow to Coldwell Banker's subsidiary, Guardian Title, would be in the nature of 1 percent of the real estate market in the four counties.[14]

At one point, the trial court announced that it would apply the substantial evidence rule in reviewing the administrative decision, i.e., that it would determine whether or not the administrative findings, conclu-

---

[13]That section provides, in pertinent part for our purposes, that a writ of mandate "may be issued by any court, except a municipal or justice court, to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, . . . ; or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled, . . . "

[14]Prior to this testimony, the department and the commissioner objected to it on the ground that Hilton had already testified at the administrative hearing, but then withdrew the objection, raised no further objection to his testifying, and conducted a cross-examination.

sions and decision were supported by substantial evidence presented at the administrative hearings. But at another point, the trial court declared that, since Insurance Code sections 839 and 839.1 did not require that a hearing be held before an administrative determination was made of their applicability to petitioners Guardian Title and Coldwell Banker, the petition for mandate was before the trial court pursuant to Code of Civil Procedure section 1085. Hence, the trial court, in considering the petition, was entitled to exercise independent judgment regarding the substantiality of the evidence in assessing the factual determinations made at the administrative level and in assessing the "fairness" of the administrative hearing.

The trial court decided in favor of Guardian Title and Coldwell Banker and thus overturned the administrative decision denying the applications for a stock permit and license to do business.

Some of the findings of fact and conclusions of law made by the trial court concerned the administrative hearing held by respondents. Thus, the trial court found that "[r]espondents' administrative hearing, although excessive in scope, was a full and complete consideration by Respondent of all facts and issues pertinent to the ORGANIZATIONAL APPLICATION and the LICENSE APPLICATION." (Finding No. 55.) The trial court also found that Guardian Title and Coldwell Banker had been represented at the hearing by counsel and had been afforded every opportunity to present their case; the findings characterized the administrative hearing as general in nature, concerned with issues which affected not only petitioners but 10 other broker-applicants.

Virtually all of the findings of the administrative decision concerning the nature of the underwritten title insurance business in California and the economic factors which determine entry into the business, were disposed of by the trial court in finding No. 25, which stated: "It is not necessary for the Court to determine whether or not these Administrative Findings of Fact[15] are supported by substantial evidence or the weight of the evidence, since the Court has determined that, *as a matter of law,* GUARDIAN'S share of the relevant market is too small to substantially lessen competition." (Italics added.) The trial court also found it unnecessary to make findings concerning the large body of evi-

---

[15]Specifically, administrative findings No. 2 through 26 (with the exception of No. 19, not adopted by the commissioner and the first sentence of No. 26).

dence introduced at the administrative hearings because the hearing afforded Guardian Title really concerned a "public policy" question rather than the applications of Guardian Title for a permit and license. The finding that Guardian Title's share of the relevant market was de minimis in terms of substantially lessening competition was the key finding made by the trial court.

Also crucial to the trial court's judgment granting the petition of Guardian Title and Coldwell Banker for a peremptory writ of mandate, was the interpretation made of the antitrust provisions of Insurance Code section 839.1, subdivision (a)(5). Declaring that the section contained antitrust provisions analogous to the federal antitrust provisions set forth in the federal Clayton Act (15 U.S.C. §§ 12-27), the court found the language of the California statute more restrictive than that of the federal law, and noted that such "vertical integration" arrangements as that of Coldwell Banker and Guardian Title were not illegal per se, citing the California Supreme Court case of *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 324 [70 Cal.Rptr. 849, 444 P.2d 481].

The trial court placed great emphasis on the impropriety of the process by which the administrative agency had reached the conclusion that Guardian Title should not be issued a stock permit and license —specifically that part of the process which involved consideration of the pending applications of 10 other similarly situated broker-owned underwritten title company applicants. Other findings and conclusions concerned abuse of discretion and denial of due process on the part of the department and the commissioner; it was concluded by the trial court that the powers of the Legislature had been usurped by the actions of the department and the commissioner.

The trial court's judgment ordered the department and the commissioner to issue to Guardian Title an organizational permit and to then issue a license to Guardian Title to enter the underwritten title business in California upon written notification that Coldwell Banker had purchased the securities of Guardian Title pursuant to the organizational permit.

The Department of Insurance and the Insurance Commissioner have appealed from the judgment granting the peremptory writ of mandate.

## III

*The Appeal From the Judgment Granting a
Peremptory Writ of Mandate Is Not Rendered
Moot by After-Judgment Events Nor Is the
Only Viable Issue on Appeal the Question
of Whether the Department and the Insurance
Commissioner Have Exceeded Their Powers
by Imposing Conditions on the Permit and
License Issued to Guardian Title*

Without seeking an augmentation of the record pursuant to rule 12(a), of the California Rules of Court, Guardian Title and Coldwell Banker, respondents on appeal, have, through their reply brief and an appendix thereto, asserted that, following the judgment, an order issued by the trial court and actions of the Insurance Commissioner, made pursuant to such order, in issuing a conditional stock permit and a license to transact business to Guardian Title, have changed the issues presented for decision on appeal, and have rendered moot the appeal of the department and the Insurance Commissioner from the judgment granting the writ of peremptory mandate. Since the department and the commissioner agree that Guardian Title and Coldwell Banker have accurately set forth the facts with respect to the after-judgment events, we will take judicial notice of these events. (Evid. Code, §§ 452, subds. (c) and (d), 459.)

The judgment granting a peremptory writ of mandate was executed and entered on November 14, 1977. The department and the Insurance Commissioner filed a notice of appeal on January 13, 1978. The appeal had the effect of staying proceedings on the judgment and the peremptory writ of mandate issued pursuant thereto. (Code Civ. Proc., § 916; *Environmental Coalition of Orange County, Inc. v. AVCO Community Developers, Inc.* (1974) 40 Cal.App.3d 513, 525 [115 Cal.Rptr. 59].) On June 20, 1978, the trial court issued an order setting aside the automatic stay. The order was issued pursuant to Code of Civil Procedure section 1110b which provides: "If an appeal be taken from an order or judgment granting a writ of mandate the court granting the writ, or the appellate court, may direct that the appeal shall not operate as a stay of execution if it is satisfied upon the showing made by the petitioner that he will suffer irreparable damage in his business or profession if the execution is stayed."

The June 20, 1978, order provided, in part pertinent to the issues before us, that "[r]espondents [the Department and the Commissioner] are hereby ordered to comply with that Writ of Mandate. This order is hereby stayed until July 6, 1978, to allow Respondents the opportunity to act as hereinafter provided or to seek such further judicial relief as they desire. [¶] IT IS FURTHER ORDERED that Respondents may, as an alternative election to the foregoing order, do all of the following: no later than June 30, 1978, approve the ORGANIZATIONAL APPLICATION of Petitioner GUARDIAN TITLE COMPANY; upon receipt of written notification by Petitioners that Petitioner COLDWELL BANKER & COMPANY has purchased the securities of GUARDIAN TITLE COMPANY pursuant to the organizational permit, immediately issue a conditional license to Petitioner GUARDIAN TITLE COMPANY, *which license shall remain in effect even if Respondent's prevail upon appeal and be revocable only in accordance with California law and upon the terms and conditions set forth in the license described hereinafter.* The conditions on this license shall be the same as those set forth and imposed upon those other conditionally licensed underwritten title companies as set forth by way of exhibits to Respondents' Points and Authorities in opposition to the motion herein, *viz.*, that of United Title Company, a conditionally licensed licensee approved by Respondents subsequent to the trial of this action, which are incorporated herein by reference. [¶] IT IS FURTHER ORDERED that, in the event Respondents elect to conditionally license Petitioner GUARDIAN TITLE COMPANY as hereinabove set forth, such conditional license shall also be without prejudice to Petitioners' entitlement to an unconditional license as may be finally affirmed in the appeal of the judgment entered by this Court." (Italics added.)

The permit to Guardian Title authorized it to issue and sell 7,000 shares of common stock at $50 per share to Coldwell Banker in order for the latter to be qualified financially for the issuance of a license to Guardian Title to act as an underwritten title company. The permit to Guardian Title was followed by a license to it to transact business as an underwritten title company. The permit imposed certain conditions. Included was a condition that Guardian Title seek outside referrals (other than from Coldwell Banker) in an amount constituting 10 percent of its business the first year, with an objective of adding 10 percent each year thereafter until, at the end of 5 years, the share of outside business would constitute 50 percent of Guardian Title's total business.

We now deal with the contention of Coldwell Banker and Guardian Title that the appeal of the department and the Insurance Commis-

sioner is now moot and that the only issue legitimately before us is whether the imposition of conditions on the permit and license exceeded the powers of the department and the commissioner. No party to this litigation has supplied us with a record which explains the nature of the showing made below by petitioners Coldwell Banker and Guardian Title to obtain the order vacating the automatic stay on appeal.

At the outset we take note of the fact that the trial judge's order, made after judgment, recites that the conditional license to be issued to Guardian Title pursuant to the trial court's order "shall remain in effect *even if Respondents prevail upon appeal* and be revocable only in accordance with California law and upon the terms and conditions set forth in the license described hereinafter. . . ." (Italics added.)

It is undisputed that the Department of Insurance and the Insurance Commissioner complied with this singular order made below. It is equally manifest that no appeal was taken by the department or the commissioner from it. However, in view of the disposition we make of this matter before us, we need not consider whether such an order is appealable.

It is crystal clear that nothing contained in Code of Civil Procedure section 1110b empowers the trial court to insulate its previous judgment from judicial review by issuing an order after judgment that purports to render appeal from the judgment meaningless. Such "bootstrapping" is not cognizable under any recognized principle of statutory or decisional law pertaining to appellate review.

It may readily be seen that a *reversal* of the trial court's judgment requires that the parties be returned as close as is possible to that position they occupied prior to the rendering of the erroneous judgment. (See Code Civ. Proc., § 908.) If the judgment is *affirmed*, it is enforceable according to its terms. In other words, our determination here will either result in Guardian Title's entitlement to a stock permit issued *without* conditions, or, it will result in Guardian Title's entitlement to no permit at all. (See *Santa Clara County Dist. Attorney Investigators Assn.* v. *County of Santa Clara* (1975) 51 Cal.App.3d 255 [124 Cal.Rptr. 115]; *Fuller* v. *San Bernardino Valley Mun. Wat. Dist.* (1966) 242 Cal.App.2d 66 [51 Cal.Rptr. 130].)

The relief ordered by the superior court under Code of Civil Procedure section 1110b was purely interim relief, effective during the pendency of this appeal. The superior court had no jurisdiction to do more than that while this appeal is pending. Although the effect of the interim order of the superior court was to authorize Guardian Title to do business under a court-ordered license, that license will expire when the remittitur of the reviewing court goes down. (See *Selby Realty Co. v. O'Bannon* (1969) 2 Cal.App.3d 917, 923 [82 Cal.Rptr. 807].)

█ As for mootness, the general rule is that a party waives the right to appeal if he *voluntarily* complies with the terms of the lower court's judgment. A waiver is implied "only if the satisfaction or compliance is by way of compromise, or is coupled with an agreement not to appeal. Where it is compelled or coerced, e.g., by the threat of forfeiture or seizure of property under execution, there is no waiver." (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 135, p. 4129; see, also, *Reitano v. Yankwich* (1951) 38 Cal.2d 1, 3 [237 P.2d 6]; *Lee v. Brown* (1976) 18 Cal.3d 110, 116 [132 Cal.Rptr. 649, 553 P.2d 1121]; *Selby Constructors, Inc. v. McCarthy* (1979) 91 Cal.App.3d 517, 521 [154 Cal.Rptr. 164]; *Signal Hill Aviation Co. v. Stroppe* (1979) 96 Cal.App.3d 627 [158 Cal.Rptr. 178].)

█ The burden here is on Coldwell Banker and Guardian Title to demonstrate that the department and the Insurance Commissioner entered into some type of compromise agreement with Coldwell Banker and Guardian Title which was intended to terminate this litigation pending the appeal. No showing has been made here that such was the case.

It seems clear that once the trial court had vacated the automatic stay of the judgment and made its order directing the issuance of the permit and the license by the department and the commissioner, they were compelled to follow the order or face a citation for contempt. Under these circumstances, the decision to comply cannot be regarded as the *voluntary* act which constitutes waiver of appeal rights. The instant case is not unlike *English v. City of Long Beach* (1950) 35 Cal.2d 155 [217 P.2d 22, 18 A.L.R.2d 547], in which English sought a writ of mandate to compel the city to vacate its order of discharge and reinstate him as a police officer. In rejecting the contention that the appeal had been rendered moot because English had been reinstated during the appeal, the court observed: "The continued employment of English by

the city resulted from the fact that he obtained a court order directing that this appeal should not operate as a stay of execution of the judgment granting the writ of mandate (Code Civ. Proc., § 1110b), and the city's inability or failure to resist the application for that order was *not* such a voluntary compliance with the writ as to render the issues moot." (*Id.* at p. 160.) (Italics added.) We conclude, therefore, that the appeal before us is not moot.

Furthermore, we decline to review on this appeal the propriety of the conditions imposed by the department and the Insurance Commissioner on the issuance of the permit and license to Guardian Title. Not only did these matters occur after judgment, but, pursuant to our analysis of the impact of our decision on the judgment, the fact that conditions were imposed upon the issuance of the permit and the license pending appellate determination of the correctness of the judgment will prove nonconsequential when the remittitur is received by the trial court.

## IV

### *The Standard for the Trial Court's Review of the Administrative Decision*

The department and the commissioner contend on this appeal that the trial court erred in conducting an independent, de novo review of the administrative decision to deny Guardian Title the stock permit it sought. As pointed out previously, it appears from the record that the trial court, although announcing at one point that it was applying the test of substantial evidence before the administrative tribunal, subsequently declared in its findings of fact and conclusions of law that it was entitled to conduct an independent review of all of the evidence —that adduced both at the administrative hearings and in the trial court.

We are not dealing here with a statewide administrative agency exercising quasi-judicial power conferred upon it by the California Constitution, but, rather, with a statewide administrative agency exercising power to make certain determinations—a power conferred upon it by the Legislature. Of some importance is the fact that the Insurance Code provisions (commencing with § 820) concerning the issuance of stock permits by the commissioner do not provide, as a matter of right, for a hearing upon a permit application. In this instance, however, the

department and the commissioner chose to afford a hearing to Guardian Title.

Although a hearing was held, it was not "required by law" in the sense that would trigger the judicial review contemplated by Code of Civil Procedure section 1094.5, i.e., the administrative mandamus section. It was agreed by the parties herein, and correctly so, that the petition for mandate was before the trial court pursuant to the traditional mandamus statute—Code of Civil Procedure section 1085. The question presented is that of the applicable standard of review. Was the trial court limited to reviewing the substantiality of the evidence introduced before the administrative agency to support the administrative determination, or, was it empowered to reassess all the evidence before the court independently—the more intrusive standard of review.

Two older California Supreme Court decisions have considered the issue. In *McDonough* v. *Goodcell* (1939) 13 Cal.2d 741 [91 P.2d 1035, 123 A.L.R. 1205], the factual background of the dispute was that the California Legislature had, by statute, conferred upon the Insurance Commissioner the duty to ascertain and determine the qualifications of an applicant for a permit to conduct a bail bond business; the statute in question was a newly enacted licensing law. Petitioners, long in the bail bond business, made application for a permit, and public hearings were held. The permit was denied, and petitioners sought judicial review.

In affirming the administrative action, the California Supreme Court stated that "it is the settled general rule of law in this state that where the legislature has by statute clothed an administrative officer with power to ascertain the facts with reference to the fitness of an applicant for a permit to engage in a business subject to regulation under the police power and has vested in such officer the discretion, based on the facts ascertained, to grant or deny a permit to engage in such business the courts will not interfere with the exercise of such discretion except in the case of an abuse thereof." (*Id.* at p. 748.) The *McDonough* court proceeds to state that one form of discretionary abuse—arbitrary action—would occur "in the event there was no sufficient factual basis for [the administrative] conclusions." (*Id.* at p. 749.) Applying the rule that judicial review was concerned with the existence of substantial evidence before the administrative agency, whether there were conflicts in that evidence or not, the *McDonough* court upheld the determination made by the Insurance Commissioner.

In *Drummey* v. *State Bd. of Funeral Directors* (1939) 13 Cal.2d 75 [87 P.2d 848], the petitioners were duly licensed embalmers, charged with certain violations of the Funeral Directors and Embalmers Law. That law provided for notice and hearing prior to revocation of a license. After hearing, the board suspended petitioners; the petitioners sought judicial review; the trial court determined the issue "on the evidence produced before the board." (*Id.* at p. 78.) It then ordered the board to reinstate the petitioners. The board appealed.

The *Drummey* court, after deciding that mandamus was the appropriate method of obtaining judicial review, posed the question in this fashion: "[W]hat weight the courts should give to the findings of the board—or, stated another way, are the findings of the board, if based on substantial although conflicting evidence, binding on the courts....?" (*Id.* at p. 84.) Reasoning that to hold otherwise would confer quasi-judicial power upon an administrative agency not designated by the California Constitution as an agency so empowered, the *Drummey* court declared that "the court to which application for mandate is made must weigh the evidence, and exercise its independent judgment on the facts, as well as on the law, if the complaining party is to be accorded his constitutional rights under the state and federal Constitutions....for a purely administrative board to deprive a person of an *existing* valuable privilege without the opportunity of having the finality of such action passed upon by a court of law, would probably violate the due process clause of the federal Constitution." (*Ibid.*) (Italics added.)

Both *McDonough* and *Drummey* were decided in 1939 and have not been overruled or questioned. *McDonough*, adhering to the substantial evidence rule, distinguished the *Drummey* holding on the ground that *Drummey* had formulated an exception to the general rule which applied only where it was determined that a party was being deprived of a "constitutional right." More recent case law has recognized that this distinction between the two approaches is dependent upon whether the right involved is "vested" or not. (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 914-915 [80 Cal.Rptr. 89, 458 P.2d 33].) The denial of a permit to an applicant (the *McDonough* situation) has traditionally been regarded as involving a nonvested right, while revocation of a permit or license already granted (the *Drummey* situation) has been regarded as involving a vested right of the permittee or licensee. In the latter case, the trial-court review is conducted on the independent-judgment-on-the-facts basis.

Both *McDonough* and *Drummey* were decided before the enactment of the Administrative Procedure Act and section 1094.5 of the Code of Civil Procedure providing for administrative mandamus. Nevertheless, the distinction between vested and nonvested rights continues to be of controlling significance not only in cases governed by administrative-mandamus principles but those which are not.

The *McDonough* court's adoption of the substantive evidence rule in vested rights cases has been relied upon in such subsequent decisions as *So. Cal. Jockey Club* v. *California etc. Racing Bd.* (1950) 36 Cal.2d 167 [223 P.2d 1], and *Crestlawn Memorial Park Assn.* v. *Sobieski* (1962) 210 Cal.App.2d 43 [26 Cal.Rptr. 421]; the *McDonough-Drummey* distinction has been discussed recently in *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 343 [156 Cal.Rptr. 1, 595 P.2d 579]. No case has been brought to our attention which specifically considers the power of the Insurance Commissioner to deny a stock permit, and the scope of subsequent judicial review of this administrative decision. The case of *Blood Service Plan Ins. Co.* v. *Roddis* (1968) 259 Cal.App.2d 807 [66 Cal.Rptr. 649], strenuously relied upon by Coldwell Banker and Guardian Title both in the trial court and on this appeal, did not address the issue of the standard of review; in that context, it is not helpful. In any event, the *Roddis* decision is readily distinguishable from the case at bench. It involved the propriety of administrative denial of a certificate to do business—a case in which the administrator had conceded that petitioner insurance company had complied with all the applicable criteria for obtaining the certificate. Under those circumstances, the appellate court found that it was an abuse of discretion on the part of the Insurance Commissioner to refuse to issue the certificate.

Most of the decisional law on judicial review has evolved in recent years from administrative proceedings reviewable pursuant to Code of Civil Procedure section 1094.5, but it has recognized the relevance of the distinction between vested and nonvested rights. In the landmark case of *Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242], the California Supreme Court held that section 1094.5 empowered the Supreme Court to establish standards for determining which cases require an independent-judgment review and which call for only a substantial-evidence review of the entire administrative record. The *Bixby* court makes clear that when the right involved is a *fundamental vested* right, the standard of judicial review is the

independent-judgment review. Agreeing with *Bixby* was *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29].

■ The *Bixby-Strumsky* rule of judicial review was explained by *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 822 [140 Cal.Rptr. 442, 567 P.2d 1162], in the following fashion: "That rule, as stated by us in *Strumsky*, provides that if the subject order or decision 'substantially affects a fundamental vested right, the court, in determining under section 1094.5 of the Code of Civil Procedure whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence. If, on the other hand, the order or decision does not substantially affect a fundamental vested right, the trial court's inquiry will be limited to a determination of whether or not the findings are supported by substantial evidence in light of the whole record.'" It is manifest that the difference between the two standards of judicial review is of substantial significance.

■ Since, in the case at bench, the trial judge applied the independent-judgment-on-the-evidence standard, the issue before us is "whether or not the administrative decision here in question 'substantially affects a fundamental vested right.'" (*Anton, supra,* 19 Cal.3d 802, 823.) The question presented is twofold: Was the right or interest of Coldwell Banker, a real estate broker, to form Guardian Title and have the latter apply for a permit to issue stock and a license to engage in the underwritten title company business a right or interest which is "fundamental"? But even assuming that the interest or right involved is "fundamental," the second aspect of the question is whether the right or interest is a "vested" interest or right.

The concept of a "fundamental" right has not been precisely defined. The *Bixby* court used language that "[i]n determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation." (*Bixby, supra,* 4 Cal.3d 130, 144.) Similarly, a "vested" right has not been defined with complete precision. The *Bixby* court defined the "vested" fundamental right in terms of a contrast between a right *possessed* and one that is merely *sought*: "[A]nd, if it is such a fundamental right, whether it is possessed by, and

vested in, the individual or merely sought by him. In the latter case, since the administrative agency must engage in the delicate task of determining whether the individual qualifies for the sought right, the courts have deferred to the administrative expertise of the agency. If, however, the right has been acquired by the individual, and if the right is fundamental, the courts have held the loss of it is sufficiently vital to the individual to compel a full and independent review." (*Bixby, supra*, 4 Cal.3d 130, 144.)

In *Anton*, the court applied the *Bixby-Strumsky* definitions and concluded that a physician's right to *renewal* of hospital and staff privileges which had been renewed annually for a number of years before, and which was now denied by a decision of the hospital's board of directors, was "both fundamental and vested within the meaning of *Bixby* and *Strumsky*." (*Anton, supra*, 19 Cal.3d 802, 825.) The *Anton* court thus continues the traditional distinction made between an application for a license (a "privilege") and the revocation of a license (a "vested right").

We conclude, therefore, that, under *Bixby, Strumsky* and *Anton*, the right or interest of Coldwell Banker and Guardian Title, which was affected by the decision of the department and the Insurance Commissioner, was neither a "fundamental" right nor a "vested" right. The appropriate standard of judicial review by the trial court below was thus the substantial-evidence test and not the independent-judgment test. It was thus error for the trial court to apply the independent-judgment test in the case before us. The trial court should not have admitted additional evidence and then relied upon it in reaching its decision. Basically the trial court reached its decision by holding that the department and the Insurance Commissioner had misinterpreted and misapplied Insurance Code sections 839 and 839.1 of the Insurance Code and, in so doing, had denied to Guardian Title and Coldwell Banker their constitutional due process rights.

Since the trial court employed the wrong standard of judicial review, its findings of fact become irrelevant to a consideration of the issue of whether the administrative decision in question is supported by substantial evidence on the whole record before the administrative agency. ■ But even when the substantial-evidence standard is applicable, the trial court must look to the entire administrative record not only to determine whether the findings are supported by substantial evidence, but also to determine "whether the agency committed any errors of law." (*Bixby, supra*, 4 Cal.3d 130, 144.)

We next consider whether the trial court was correct in holding that the department and the Insurance Commissioner had committed errors of law in interpreting their powers under the relevant Insurance Code section. We also consider, in view of the trial court's failure to do so, whether a review of the entire administrative record establishes that the findings and decision are supported by substantial evidence.

V

*The Administrative Decision Does Not Involve Any Errors of Law and the Administrative Findings of Fact and Decision Are Supported by Substantial Evidence on the Whole Record*

Of crucial importance in this litigation is the meaning to be attributed to section 839.1 of the Insurance Code. It is true that, insofar as we have been able to discover, no legislative guidance in the form of committee reports or other materials exists with respect to this 1965 enactment of the Legislature.[16] Thus, we must turn elsewhere for aids to appropriate interpretation.

A review of article 8 of the Insurance Code, commencing with section 820, and concerned with the issuance of securities by insurers, reveals that the department and the Insurance Commissioner have been charged with the duty and responsibility of monitoring the issuance of such securities in broad terms, rather than in terms of limitation. The legislative objective appears to be not only to safeguard the rights of shareholders but other important members of the public—the consumers.

The Legislature, as it is entitled to do, has delegated broad powers to the department and the Insurance Commissioner—powers which include the power to determine not only the present danger but *potential* danger to competition in the insurance industry presented by various business combinations and arrangements. The language of Insurance Code section 839.1 does not suggest that the section was intended to deal only with mergers but rather with *any* business combination likely to have damaging economic consequences; there is no

---

[16]Section 839.1 was enacted into law as set forth in Senate Bill No. 559, introduced by Senator Dolwig on February 18, 1965. The Legislative Counsel's Digest merely summarizes its content.

language in the section which supports the view that only *horizontal* arrangements were to be subject to administrative scrutiny.

Among the distinguishing features of section 839.1 is the fact that administrative antitrust inquiry may commence at the critical stage *prior* to the issuance of a stock permit to an insurer applicant. Much was made below of the purportedly erroneous process employed by the department and the commissioner at the administrative level of taking into account the existence of a number of applications pending which were similar to those of Guardian Title in assessing the impact of the business arrangement involved on competition in the title insurance industry. Under Insurance Code section 839.1, we deem it appropriate —and indeed, necessary—for the department and the commissioner to make the scope of their inquiry include the factor of similar pending applications. To hold otherwise and to limit the administrative decision-making power to consideration of each application in a vacuum, requiring the administrative agency to ignore that application's significance as part of a trend toward an unhealthy concentration of economic power, would rob section 839.1 of much of its effectiveness.

The narrow construction of Insurance Code section 839.1, favored by the trial court on this issue, led, in turn, to a misguided search for antitrust principles applicable to single entities rather than a consideration of the many elements which attain significance with respect to an entire industry.

All of the parties to this litigation recognized, and quite reasonably so, that the language of Insurance Code section 839.1, subdivision (a)(5), referring to a denial of a permit in the case of those business arrangements which "will substantially lessen competition in the insurance business" was similar to that employed in the federal antitrust legislation, i.e., the Sherman Act (15 U.S.C. §§ 1-7) and the Clayton Act (15 U.S.C. §§ 12-27), and that the case law interpreting federal antitrust legislation would offer some assistance to the task of interpreting section 839.1.

While Guardian Title and Coldwell Banker have characterized section 839.1 as a "little Clayton Act," such a description is overly simplistic. ■ As a preliminary matter, it is to be noted that our statute is unlike the federal Sherman and Clayton Acts because it operates in the context of permit issuance; the burden of compliance with its terms is on the applicant, rather than on the government or a complaining party to establish antitrust violation pursuant to federal law.

Nor do we accept the interpretation, urged below by Guardian Title and Coldwell Banker, that section 839.1 is more restrictive in its language than the federal legislation because of the section's use of the word "will"; that usage merely portends that the department and the commissioner have the power and the duty to consider *potential* threat to competition in addition to *current* danger.

In pursuit of analogies, Guardian Title and Coldwell Banker urge that the most appropriate reference in federal law is that contained in section 3 of the Clayton Act (15 U.S.C. § 14)[17] and concerned with the monopolistic effect of exclusive dealing contracts. We are urged to view the Coldwell Banker-Guardian Title arrangement as such a contract, and invited to accept the holding of *Tampa Electric Co.* v. *Nashville Co.* (1961) 365 U.S. 320 [5 L.Ed.2d 580, 81 S.Ct. 623], as dispositive of the case at bench.

The *Tampa* case was concerned with the antitrust implications of a requirements contract entered into between a public utility and a coal producer. *Tampa* is particularly helpful here in that it discussed the type of evidence necessary in antitrust litigation to assist a court in determining what constitutes "substantial" lessening of competition. That evidence was described in *Tampa* in the following terms: "*First*, the line of commerce, *i.e.*, the type of goods, wares, or merchandise, etc., involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case. *Second*, the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies. In short, the threatened foreclosure of competition must be in relation to the market.... [¶] *Third*, and last, the competition foreclosed by the contract must be found to constitute a substantial share of the market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited...." (*Tampa, supra*, 365 U.S. 320, 327-328 [5 L.Ed.2d 580, 587]; fn. omitted.)

---

[17]"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale...or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

The *Tampa* court proceeds to state that "[t]o determine substantiality in a given case, it is necessary to weigh the *probable* effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the *probable* immediate and future effects which preemption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence." (*Id.* at p. 329 [5 L.Ed.2d at p. 588].) (Italics added.) In *Tampa*, it was held that evidence establishing that the contract when performed would only constitute 1 percent of the total volume of business in the relevant market area precluded the conclusion of antitrust violation, because the 1 percent was considered de minimis as a matter of law in terms of competitive effect.

In the case at bench, the trial court ruled, as a matter of law, that 1 percent of the market was also de minimis and, as a consequence, refused to weigh the large body of administratively adduced evidence emphasizing the economic factors extant in the title insurance industry in California which led to the administrative conclusion that the Coldwell Banker-Guardian Title arrangement would eventually foreclose a substantial portion of the market to competition not similarly situated.

We conclude that neither the trial court's *factual* determination with respect to the purported 1 percent—which was beyond the scope of its review power—nor the legal conclusion of de minimis can be supported on the record before us.

As to the factual determination, it rests on the in-court testimony of Charles R. Hilton, president of Guardian Title, which was substantially the same as that presented at the administrative hearing. At the administrative hearing, Hilton was asked: "In Los Angeles County do you have any idea what percentage of the real estate market that Forest E. Olson [a subsidiary] and Coldwell Banker and its other subsidiaries have?" Hilton answered as follows: "A. I can answer that this way: It would take a lot of extrapolation. It would be conjecture on my part. I can go back to 1969 when Forest E. Olson was acquired by Coldwell Banker. We had a Justice Department inquiry at that time because of the merger of two leading real estate firms and we hired a fellow

—don't recall his name—to do a survey to see what percentage of the reported real estate activities there was. He reported to the Justice Department that that was somewhere in the area of 1 percent. [¶] Q. Total? [¶] A. Total. [¶] Q. In Los Angeles? [¶] A. I think that was for the whole state. I believe it was for the whole state because the inquiry was related to the state. Coldwell Banker has offices in the North and the South. [¶] Q. Right. Don't you as some sort of business practice try to get some ball park figure as to the percentage of the business you are getting? [¶] A. No, because it is a very bifurcated business because we don't do so much work in Los Angeles County. The county figures would be meaningless."

We note that trial took place in 1977; in the annual report of 1974 Coldwell declared that, since the acquisition of Forest E. Olson Company, it was the largest residential brokerage firm in Los Angeles County. The problem which is presented, however, is not necessarily that of the credibility of the witness. The problem is that this testimony is practically meaningless because "the market" is not identified in terms of whether the percentage reference is to the *number* of sales transactions or to the *dollar volume* of those transactions. The testimony appears to be limited to the number of sales, rather than to all facets of real estate transactions such as the dollar volume and the size and character of the real estate involved in each transaction. Testimony based upon a "survey" done by some unnamed party in 1969 has little, if any, relevance to the business position enjoyed by Coldwell Banker in 1977. Certain minimal requirements of precision must prevail in the quality of evidence which supports a factual finding. It must be evidence which possesses "solid value." The Hilton testimony did not meet this standard. The Insurance Commissioner was not required to accept and give substantial weight to this kind of flimsy, conjectural and insubstantial evidence.

In addition, the trial court's legal conclusion that "1%" was de minimis as a matter of law was erroneous in the context of the present case. A more appropriate analogy in federal antitrust law is found in section 7 of the Clayton Act (15 U.S.C. § 18),[18] and the case law which inter-

---

[18]That section provides, in pertinent part, that "[n]o corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be *substantially* to lessen competition, or tend to create a monopoly." (Italics added.)

prets it. In *Brown Shoe Co.* v. *United States* (1962) 370 U.S. 294 [8 L.Ed.2d 510, 82 S.Ct. 1502], it is made perfectly clear that no one definition of "substantially," insofar as lessening competition is concerned, was intended by the Congress to control the assessment of mergers, "whether in quantitative terms of sales or assets or market shares or in designated qualitative terms, by which a merger's effects on competition were to be measured." (*Id.* at p. 321 [8 L.Ed.2d at p. 533].) One very important element perceived in *Brown* was the special situation that prevailed in the particular industry involved. The special situation would take into account factors such as the economic motivation behind the arrangement, its "nature and purpose," and "the trend toward concentration in the industry."

To the extent which the Coldwell Banker-Guardian Title arrangement can be regarded as "vertical," *Brown* aptly points out that "[e]very extended vertical arrangement by its very nature, for at least a time, denies to competitors of the supplier the opportunity to compete for part or all of the trade of the customer-party to the vertical arrangement. However, the Clayton Act does not render unlawful all such vertical arrangements, but forbids only those whose effect 'may be substantially to lessen competition, or to tend to create a monopoly'..." (*Brown, supra,* 370 U.S. 294, 324 [8 L.Ed.2d 510, 535].)

Guardian Title and Coldwell Banker also relied below on a single statement contained in *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 324 [70 Cal.Rptr. 849, 444 P.2d 481], a pleading case. The statement sets forth that "[n]ot only are vertical distribution agreements in this instance contemplated by the Insurance Code, but '[i]t seems clear to us that vertical integration, as such without out more, cannot be held violative of the Sherman Act.'" But the *Chicago Title* case was not concerned with vertical business arrangements and potential application of Insurance Code section 839.1. In addition, we agree that a vertical business arrangement per se connotes nothing unlawful, but the contrary may be true when the arrangement is assessed in relation to a particular set of facts in a particular industry.

The *Brown* court emphasizes the multiplicity of factors present in antitrust determinations—factors of the kind developed by witnesses, including experts, at the administrative hearings held in the case at bench. We hold that the Insurance Commissioner was not required to single out one factor and reject consideration of all other

factors in arriving at his conclusion. Much of the evidence at the administrative hearings was uncontroverted and there is no basis in the administrative record for any finding by the trial court that the administrative decision was *not* supported by substantial evidence on the whole record.

As our discussion indicates, we have also concluded that the trial court's error in applying the wrong standard of review was compounded by misinterpretation and misapplication of section 839.1 of the Insurance Code. This section, despite Guardian Title's and Coldwell Banker's characterization of it as unconstitutionally vague, clearly demonstrates legislative intent to confer upon the department and the Insurance Commissioner the duty and the power to investigate potentially dangerous business combinations and arrangements which threaten healthy competition in the title insurance industry. The language of the section contemplates the exercise of discretion by the administrative entities involved. That discretion was employed to consider that the "total transaction" referred to in Insurance Code section 839.1 included recognition of trends toward concentration of economic power portended by other similar pending applications. While discretion is not without limitation, we hold that it was properly exercised by the department and the commissioner in the case at bench in the decision denying Guardian Title's applications for an organizational permit and a license to transact business as an underwritten title company. The decision is amply supported by substantial evidence in light of the entire record.

The judgment is reversed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied March 13, 1980, and respondents' petition for a hearing by the Supreme Court was denied May 14, 1980.