[No. B103279. Second Dist., Div. Seven. Mar. 25, 1997.]

KENSINGTON UNIVERSTIY, Plaintiff and Appellant, v.
COUNCIL FOR PRIVATE POSTSECONDARY AND VOCATIONAL
EDUCATION et al., Defendants and Respondents.

## COUNSEL

Alfred A. Calabro for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Charlton G. Holland III, Assistant Attorney General, John H. Sanders and Wendi A. Horwitz, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**LILLIE, P. J.**—Kensington University (University) appeals from judgment denying its supplemental petition for writ of mandate which sought to vacate the decision of defendant Council for Private Postsecondary and Vocational Education (Council) denying University's application to operate as a degree-granting institution under Education Code section 94310. On appeal, University contends that certain procedures employed by Council deprived it of due process of law and constituted abuses of discretion, that the trial court failed to apply the proper standard of review to the record of the administrative hearing, the trial court erred in applying the law, and that Council's decision is not supported by substantial evidence.

### FACTUAL AND PROCEDURAL BACKGROUND

Council is authorized under Education Code section 94310 to approve applications for private postsecondary educational institutions to operate in California. In 1989, the Legislature enacted a comprehensive system of statutes known as the Private Postsecondary and Vocation Reform Act of 1989 (hereinafter Act; Ed. Code, §§ 94300 to 94350), which became effective on January 1, 1991. The Act transferred the responsibility for approving and regulating private postsecondary schools from the Department of Education to the newly created Council. At the times pertinent herein, Kenneth A. Miller was executive director of Council.

University began operating in 1976 as an "allowed" institution under former Education Code section 29023, subdivision (a)(3), which provided in pertinent part that "filing pursuant to this section shall not be interpreted to mean . . . that the State of California, the Superintendent of Public Instruction, the State Board of Education . . . or any division or bureau thereof, has made any evaluation, recognition, accreditation, approval, or endorsement of the course of study." In 1984, former Education Code section 94310, subdivision (c), was modified to include provisions for a review by a visiting committee; in 1986, former Education Code section 94310, subdivision (c), was renumbered section 94310.3. Under former Education Code section 94310, subdivision (c), the visiting committee's responsibilities were to verify the financial stability of the institution. Any authorization received pursuant to former section 94310.3 "shall not be interpreted to endorse, and it is unlawful for, any institution to represent by any means that the State of California . . . has made any accreditation or endorsement of the course of study or degree." (Former Ed. Code, § 94310.3, subd. (h).)

Under Education Code section 94310, as enacted in 1989, the Legislature granted schools which had prior authorization under former Education Code section 94310.3, the status of "candidate for approval" and required that the candidate file an application for approval within three years. (Ed. Code, § 94310, subd. (i).) Thus, on January 1, 1991, University operated under "candidate for approval" status until January 1, 1994; before the expiration of the three-year period after January 1, 1991, University was required to submit an application for approval to Council under new standards set out in Education Code section 94310.[1] Council was given authority pursuant to section 94305, subdivision (b), to establish minimum criteria for the approval of private postsecondary or vocational educational institutions to

---

[1]Unless otherwise specified, all statutory references are to the Education Code.

Section 94310 provides in pertinent part that "No private postsecondary educational institution may issue, confer, or award an academic or honorary degree unless the institution meets the requirements of subdivision (a) or (i), as follows: [¶] (a) The institution is approved by the council to operate in California and award degrees. . . . [¶] (b) The approval process shall include a qualitative review and assessment of all of the following: [¶] (1) Institutional purpose, mission, and objectives. [¶] (2) Governance and administration. [¶] (3) Curriculum. [¶] (4) Instruction. [¶] (5) Faculty, including their qualifications. [¶] (6) Physical facilities. [¶] (7) Administrative personnel. [¶] (8) Procedures for keeping educational records. [¶] (9) Tuition, fee, and refund schedules. [¶] (10) Admissions standards. [¶] (11) Financial aid policies and practices. [¶] (12) Scholastic regulations and graduation requirements. [¶] (13) Ethical principles and practices. [¶] (14) Library and other learning resources. [¶] (15) Student activities and services. [¶] (16) Degrees offered."

Further, pursuant to subdivision (a) of section 94310, "The council shall not issue an approval under subparagraph (A) of paragraph (1) of subdivision (d) or a conditional approval under subparagraph (B) of paragraph (1) of subdivision (d) until it has conducted a qualitative review and assessment of, and has approved, each degree program offered by the institution and all of the operations of the institution, and has determined all of the following: [¶] (1) The

operate in California and award degrees, and pursuant to section 94305, subdivision (c), Council was to adopt rules and regulations governing the conduct of such postsecondary institutions. Council submitted three sets of emergency regulations to the Office of Administrative Law, which were approved as emergency regulations and filed with the Secretary of State beginning August 17, 1992. Permanent regulations were approved and filed on April 19, 1994. These regulations appear as section 70000 et seq., in title 5 of the California Code of Regulations.

On July 12, 1993, University submitted, for the first time, an application under the Act for approval to operate as a degree-granting institution in California, seeking approval for its programs in business administration, computer science, environmental science, law, engineering, education administration, political science, and psychology counseling. Council impaneled a visiting committee for an on-site review, which was conducted on several days in February and March 1994. On April 6, 1994, Council sent to University the visiting committee's report, which identified areas of noncompliance with the Act by University.

With respect to the mission statement, the visiting committee recommended revising the statement to focus on the goals and objectives of the institution and also required University to provide documentation on the populations actually being served by University. With respect to the issue of administrative personnel, the committee found a violation of the requirement for a personnel manual with job descriptions for each primary administrative

---

institution has the facilities, financial resources, administrative capabilities, faculty, and other necessary educational expertise and resources to ensure its capability of fulfilling the program or programs for enrolled students. [¶] (2) The faculty are fully qualified to undertake the level of instruction that they are assigned and shall possess appropriate degrees or credentials and have demonstrated professional achievement in the major field or fields offered, in sufficient numbers to provide the educational services. [¶] (3) The education services and curriculum clearly relate to the objectives of the proposed program or programs and offer students the opportunity for a quality education. [¶] (4) The facilities are appropriate for the defined educational objectives and are sufficient to ensure quality educational services to the students enrolled in the program or programs. [¶] (5) The course of study for which the degree is granted provides the curriculum necessary to achieve its professed or claimed academic objective for higher education, and the institution requires a level of academic achievement appropriate to that degree. [¶] (6) The institution provides adequate student advisement services, academic planning and curriculum development activities, research supervision for students enrolled in Ph.D. programs, and clinical supervision for students enrolled in various health profession programs. [¶] (7) If the institution offers credit for prior experiential learning it may do so only after an evaluation by qualified faculty and only in disciplines within the institution's curricular offerings that are appropriate to the degree to be pursued. The council shall develop specific standards regarding the criteria for awarding credit for prior experiential learning at the graduate level, including the maximum number of hours for which credit may be awarded."

position and a job performance evaluation process. With respect to the issues of curriculum and instruction, the committee report noted many students had completed Ph.D. programs, but their files failed to verify that a dissertation had been completed; in several instances, there was an unqualified dissertation committee; in some instances, the student dissertations did not meet accepted standards for a dissertation; some programs lacked academic rigor; the environmental science program lacked laboratory instruction, which is typically included in this type of program at more traditional institutions, and also lacked documentation of student learning outcomes, no criteria for determining experiential learning credits, and course outlines did not contain sufficient detail in defining prerequisites, course requirements, or learning outcomes. The non-bar juris doctor program did not meet the admission and graduation requirements of the California Code of Regulations (hereinafter regulations); the transfer policy of the doctor of jurisprudence program did not meet the requirements of the regulations.

In the engineering and computer science programs, the visiting committee found that course outlines did not exist for engineering; University administration was working on developing course outlines, but there was no faculty involvement in the development of the curricula; courses in the graduate program were not appropriate for advanced level courses; student files also revealed in several instances that experiential learning credits were not documented as being earned at college level and as relating to the degree program in which the student was enrolled. As to the degree programs in psychology, the visiting committee found the sequence of course work to be poorly defined, the curricula for the masters and doctoral degrees were not entirely appropriate for that particular degree title in psychology counseling, and none of the doctoral students whose files were reviewed had taken any research-oriented courses; the overall quality and content of the Ph.D. program was low.

The committee also found there were an insufficient number of faculty, at the appropriate level, to provide instruction, with only 11 current faculty for about 700 students; many faculty were working in an academic area in which they did not have qualified expertise; the committee had a "serious question that the program in Public Administration should even be offered," as only one faculty member was qualified in the area. The faculty for environmental science was found not to be appropriately qualified, and the doctoral committee was not appropriate for a Ph.D. in this subject. The committee also found insufficient faculty with appropriate qualifications to support the psychology counseling programs or to provide adequate supervision for doctoral students; it was also recommended that University establish standards for student evaluation.

With respect to the physical facilities, University was required to establish a process for ensuring students have access to the appropriate level of library resources for their level of program. The committee also recommended numerous changes in University's admissions standards, including the award of experiential learning credits and transfer credits; also recommended were improvements in the recordkeeping process, increased faculty contact with students, and that advisers of Ph.D. candidates have the appropriate degree level and discipline for the student objectives.

On May 4, 1994, University submitted a 561-page response to the visiting committee's report; University provided some documentation requested by the committee, but other information was lacking; the response failed to contain a job description for the president of University, and there was no indication when a newly established job performance evaluation process was to be implemented; the evaluation process was not included in the personnel manual. Although the response indicated that more faculty were currently assigned to various programs, with a current faculty of 41 in May 1994, University also was in the process of "continuing a comprehensive review and enhancement of all existing University academic standards and objectives for all schools and educational programs . . . ." The response detailed new admissions standards, grading criteria, expanded forms for student evaluation and an expanded format for course syllabi, which included course goals and expected student learning outcomes. An outline for one course appeared in the response, apparently offered as a sample of the new format for the development of new outlines for over 400 courses offered by University. The response also contained a new policy and criteria for experiential learning credit, new policies and procedures for doctoral degree programs and doctoral degree committees. The response also pointed out alleged "errors of observation" by the visiting committee, and provided actual student files and records to show correct facts. In response to concerns expressed in the visiting committee report, University also provided copies of its recently revised enrollment agreement.

In June 1994, the Degree-Granting Institutions Standing Committee proposed to Council that University's application be denied; Council accepted the recommendation for denial. By letter dated July 4, 1994, Council advised University of the denial of its application and delineated the grounds of denial. The letter contained citations to the governing regulations, the compliance issues and findings of the visiting committee, summaries of University's responses to each issue, and then Council's comment to the University's response. One of the grounds for denial dealt with the requirement of section 71710, subdivision (b) of title 5 of the regulations that "The institution shall maintain a course outline for each course offered." The letter

stated that "Course outlines are the architectural structure for each course offered, to be developed through a faculty involvement process. A change of format is cosmetic. Without faculty involvement and participation in modifying the 437 courses offered by the University, and without an administratively-supported direction for the ultimate objectives and student learning outcomes for each degree program, this is a pro-forma exercise. At the time of the review, none of the issues relating to missions, governance, curricula or faculty met minimum standards for degree program delivery. Admission requirements and scholastic regulations were also substandard. These issues, to be addressed, require a total restructure of the institution."

With respect to the issue of the inadequacy of the faculty, Council acknowledged that University "has virtually doubled the number of faculty at the institution; this has been done in a 30-day period. There is no evidence of faculty involvement in the selection/review process. The fact that there are now 22 additional bodies, on paper, does not address the years of insufficient, and often inappropriate faculty resources to instruct students. The institution would do well to develop a core academic program, and slowly expand it, with judicious recognition of the appropriate resources required for program delivery, administration, and monitoring."

In commenting on University's response in general to the visiting committee report, Council stated in its July 1994 letter: "[University] reinvented itself after the visit. If it were to operate according to everything they purport to do, it *might* be an institution that meets minimum standards. However, the institution was reviewed under California Code of Regulations that have been operative since August 1992. On the visit, it was learned that the institution's operation did not conform to the information included in the application, nor did it conform to the minimum standards established in the Emergency Regulations approved in August of 1992. [¶] Kensington University, with its response, proposes new policies, new procedures, and new agreements—all on paper. There is no way currently to determine if the modus of operation has changed. The institution might do well to consider beginning a new operation in compliance with all requirements for operation as a degree-granting institution. [¶] Kensington, almost verbatim, utilized the University of Phoenix's mission statement and adopted it as its own. This creates false impression in that one reading it thinks it is really that of Kensington's. A mission statement is to be used as the framework for establishing goals of [a] school. Here it was not. An obvious afterthought. . . . [¶] For the reasons stated above, the application for approval

is being denied pursuant to Section 94310(d)(1)(C) of the California Education Code."[2]

University appealed Council's denial of its application.[3] An administrative hearing was scheduled for May 1995. In September 1994, Council conducted an audit of University's books and records, focusing on the calculation and payment of student refunds. In March 1995, in connection with the administrative hearing before an administrative law judge, Council filed a second amended statement of issues, which detailed numerous violations of the regulations in title 5, division 7.5 of the regulations (hereinafter title 5).

The statement of issues set out the following violations which were found to exist *at the time of the site review*: (1) University's mission statement was inadequate (tit. 5, §§ 71000, subd. (p), 71705, subd. (a); Ed. Code, § 94330, subd. (k)(2)) and it was also learned in June 1994, that an amended

[2]Subdivision (d)(1) of section 94310 provides in pertinent part that "Within 90 days of the receipt of the visiting committee's evaluation report and recommendations, or any reasonable extension of time not to exceed 90 days, the council shall take one of the following actions: [¶] (A) If the institution is in compliance with this chapter and has not operated within three years before the filing of the application in violation of this chapter then in effect, the council may grant an approval to operate for a period not to exceed five years. [¶] (B) If the institution is in compliance with this chapter, but has operated within three years before the filing of the application in violation of this chapter then in effect, or if the council, in its discretion, determines that an unconditional grant of approval to operate is not in the public interest, the council may grant a conditional approval to operate subject to whatever restrictions the council deems appropriate. . . . [¶] (C) The council deny the application. If the application is denied, the council may permit the institution to continue offering the course of instruction to students already enrolled or may order the institution to cease instruction and provide a refund of tuition and all other charges to students."

Section 94330, subdivision (k) provides in pertinent part: "The council may refuse to issue or renew any private postsecondary or vocational educational institution's approval to operate, or may revoke any approval to operate for any one, or any combination, of the following causes: [¶] (1) A violation of this chapter, or any standard, rule or regulation established under this chapter. [¶] (2) Furnishing false, misleading, or incomplete information to the council, or the failure to furnish information requested by the council or required by this chapter. [¶] . . . [¶] (5) The failure of the institution to maintain the minimum educational standards prescribed by this chapter, or to maintain standards that are the same as, or substantially equivalent to, those represented in the school's applications and advertising. [¶] . . . [¶] (8) The failure to provide timely and correct refunds to students. [¶] . . . [¶] (12) The failure to correct any deficiency or act of noncompliance under this chapter, or the standards, rules, regulations and orders established and adopted under this chapter within reasonable time limits set by the council. . . ."

[3]University also sought relief from Council's decision by filing a petition for writ of mandate in the superior court. On August 8, 1994, the superior court granted a stay of the implementation of Council's denial of approval until the effective date of any decision after hearing under the Administrative Procedures Act. The August 8, 1994, order stated that "There has been no denial of due process of law to date by virtue of [Council] having properly and fully followed the applicable statutes and regulations."

mission statement was admittedly plagiarized from the mission statement of the University of Phoenix; (2) University's personnel manual was incomplete in failing to include a job description for its president (tit. 5, § 71730, subd. (b); Ed. Code, § 94330, subd. (k)(2)) and did not state when a newly created performance evaluation process would start; (3) University's affiliations with educational institutions in other countries, such as Japan and Australia were not documented with confirmation of the authority under which the programs were approved to operate in the foreign countries (Ed. Code, § 94330, subd. (k)(2)); (4) course outlines (tit. 5, § 71710, subd. (b)) were not maintained for each course at time of the site review; (5) curricula for the degree programs in environmental science did not require any laboratory courses as prerequisites, and thus the curricula did not support the environmental science degree programs; (6) the curricula in engineering and psychology counseling did not include prerequisites for the courses to show a logical development of knowledge and expertise, and the curricula for the masters and Ph.D. degrees in psychology counseling failed to include appropriate standard instruction in psychopathology, physiological psychology, and research methodology, among others, and the Ph.D. program for psychology counseling also was of overall low quality; (7) the faculty on the dissertation committee did not possess the required qualifications for any of respondent's doctoral programs, and an insufficient number of duly qualified faculty were employed to support the degree programs in law, business, education and public administration; and the faculty for the environmental science and psychology counseling disciplines were unqualified; (8) the award of credits for experiential learning violated the requirements of section 71890 of title 5; (9) University awarded Ph.D. degrees in violation of the requirements of sections 71875, 71880, and 71885 of title 5; (10) University violated section 71270 of title 5 by failing to provide a library or to assure that students have access to appropriate library collections and resources and to document compliance with such requirements; (11) University violated sections 94312, subdivision (f) and 71805 of title 5, pertaining respectively to the calculation of refunds upon withdrawal or cancellation Ed. Code, § 94330, subd. (k)(8)), and to the format of its enrollment agreement; (12) faculty and student files were not maintained with the detail and consistency required by sections 94312 and 71920 of title 5.

After hearing and posttrial briefs by the parties, the administrative law judge (ALJ) issued a proposed decision dated September 20, 1995, determining that numerous regulatory violations found by the site committee were supported by a preponderance of the evidence. The ALJ found that the personnel manual was still incomplete in some respects, but that University had properly documented its affiliation with a Japanese educational institution; although the ALJ found that the state of the record did not support the

findings of inadequate course outlines for the business, education and public administration programs, the ALJ agreed with the allegations of deficiencies in curricula with respect to the environmental science, engineering, and psychology counseling programs; the ALJ found the faculty doctoral committees did not meet the regulatory requirements and that in many programs the faculty was inadequate in number and/or insufficiently qualified for the programs; the ALJ found violations with respect to the award of experiential learning credits and transfer credits; the ALJ found violations of scholastic regulations in the awarding of degrees, violations with respect to the format of enrollment agreements and in recordkeeping. Although the ALJ found that student refunds were not calculated according to the formula required by the regulations, University's schedule of repayments exceeded the sums claimed to be due by Council. The ALJ found that the record did not support violations with respect to the mission statement and affording of library facilities.

In a portion of the proposed decision captioned "Special Findings," the ALJ found that University "is not a diploma mill. [¶] Many of [University's] violations are minor, or of little consequence in over-all enforcement. The statute and rules are often needlessly highly technical and subject to varying determinations. As examples in defense of University—the use of another's existing mission statement presents no violation of law, in and of itself; the University's 'liberal' grading policy is no worse than the lawful 'pass-fail' grading system; and the 'acceptable' length of a dissertation is merely a conundrum. In addition, to compound difficulties, we have site committee members publicly quarreling over the Council's action. . . . [¶] Based upon its compliance record to date, the University's application can justifiably be denied. But in evaluating the various equities involved, in particular, its lengthy past service (i.e., [since] 1976) to the community, its long standing compliance record under the prior law, and its numerous successful graduates, make a strong statement for its continued viability under a more structured and strident administration and faculty. [¶] Although some of Kensington University's programs are clearly stronger than others, the University intends to concentrate on academic programs and degree levels which can be brought quickly into compliance. . . . This activity is under way and full compliance is *likely* to be achieved if granted a reasonable extension of time."

Thus, although the ALJ's decision concluded that University's violations "constitute grounds for refusing to issue an approval to operate as an educational institution pursuant to Section 94310 of the Education Code," the ALJ also found that no purpose would be furthered to deny University an

extension of time in order to conform to existing statutes and regulations. The ALJ proposed an order providing in pertinent part that "An extension of twenty-four months shall be granted to the respondent in order to comply with the existing statutes and regulations."

On October 27, 1995, Council issued a "Notice of Rejection of the Proposed Decision." University submitted a response to the Notice of Rejection. On December 21, 1995, Council issued a "Final Decision" denying University's application for approval to operate in California and award degrees. As to the alleged violations, the Final Decision was in most respects consistent with the findings of the ALJ, although Council determined two additional violations not found by the ALJ: Council found that University failed to provide confirmation of the authority under which it offered education services to students in Japan, and Council found a violation with respect to the provision of library services, inasmuch as there was no written documentation in student files concerning accessibility of library resources and whether such resources were utilized by students. The Final Decision provided that University's violations constitute grounds for refusing to issue an approval to operate as an educational institution under sections 94310 and 94330, subdivision (k), and that there "is no authority for extensions of time for purposes of compliances under the Postsecondary Act when the findings support a denial. (Ed. Code, § 94330, subd. (k)(1).)"

On February 21, 1996, the superior court continued its stay issued on August 8, 1994, until April 26, 1996. On April 4, 1996, University filed a supplemental petition for writ of mandate and memorandum of points and authorities in support thereof. On April 18, 1996, Council filed an answer to the supplemental petition and lodged the administrative record with the court. After several continuances of the hearing to permit both parties to file supplemental pleadings, the matter was heard and submitted on May 3, 1996. On May 3, 1996, the superior court issued a minute order denying the supplemental petition for writ of mandate and directing Council to prepare, serve and file a proposed statement of decision and proposed judgment. The proposed statement of decision contained 12 conclusions of law, including the conclusions that the findings in the Council's decision were supported by substantial evidence in light of the whole record; that the emergency regulations found at title 5 were valid and enforceable against University beginning August 17, 1992, until the permanent regulations were adopted on April 29, 1994; that University had a fair trial and there was no denial of due process of law by Council; and that University's violations of the Act constitute grounds to deny its application for approval to operate as a degree-granting institution under sections 94310 and 94330, subdivision (k),

and that there is no authority for extensions of time for compliance when the findings support a denial.

After University filed a notice of objection to Council's proposed statement of decision, the superior court issued a minute order notifying the parties that the statement of decision and judgment were signed and filed on June 3, 1996. On June 6, 1996, University sought a hearing on its objections to the statement of decision; the court issued a minute order denying a hearing, but stating that it had considered University's objections, and reasserted the previously signed statement of decision, deeming it signed and filed on June 6, 1996. University filed timely notice of appeal from the judgment.

I

### TRIAL COURT STANDARD OF REVIEW

We find without merit appellant's contention that the trial court erred in applying a substantial evidence standard of review of the evidence in the administrative record instead of an independent judgment standard of review.

" 'The trial court is authorized to exercise its independent judgment on the evidence where the administrative agency is of legislative origin and its decision affects a fundamental vested right. [Citation.]' [Citation.] [¶] On the other hand, the trial court may not exercise its independent judgment, but must instead review the entire record for substantial evidence, if the agency is of constitutional origin and has been granted limited judicial power by the constitution [citation] or if the Legislature '. . . accord[s] finality to the findings of a statewide agency,' i.e., if the Legislature expressly provides that the trial court will review decisions of the agency under the substantial evidence test. [Citation.]" (*Dominey* v. *Department of Personnel Administration* (1988) 205 Cal.App.3d 729, 741 [252 Cal.Rptr. 620].)

In the instant case the Legislature has provided by statute that a party aggrieved by Council's final decision and order "may seek judicial review by filing a petition for writ of mandate pursuant to Section 1085 of the Code of Civil Procedure within 30 days of the issuance of the final decision and order." (§ 94323, subd. (k)(1).) Further, the Legislature has provided in pertinent part that "The court shall deny the petition for a writ of mandate if the record submitted by the party is incomplete. The court shall not consider any matter not contained in the record. The factual bases supporting the final decision set forth in the council's statement of decision

shall be conclusive if supported by substantial evidence on the record considered as a whole." (Ed. Code, § 94323, subd. (k)(2).) The foregoing statute was enacted in 1994, and effective on January 1, 1995. Accordingly, we conclude that the statute governed the instant supplemental petition for writ of mandate, filed in April 1996, and decided by the trial court in June 1996. (See *Anton* v. *San Antonio Community Hospital* (1982) 132 Cal.App.3d 638, 650 [183 Cal.Rptr. 423] [procedural statute operates in future if the trial postdates the enactment, regardless of the time of occurrence of the events giving rise to the cause of action].)

Accordingly, we conclude that appellant's reliance on *Cleveland Chiropractic College* v. *State Bd. of Chiropractic Examiners* (1970) 11 Cal.App.3d 25 [89 Cal.Rptr. 572], and other cases cited in its opening brief, is misplaced, as the cases are inapposite. Moreover, even had there not been the statute governing the trial court's standard of review herein, we would conclude that *Cleveland Chiropractic*, although factually similar in some respects to the posture of appellant herein, would not control because it was decided prior to *Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242], and thus *Cleveland Chiropractic* did not apply the analytical framework set out in *Bixby* for determining the proper standard of review.[4] For the foregoing reasons, we conclude that appellant fails to establish that

---

[4]"The *Bixby-Strumsky* rule of judicial review was explained by *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 822 . . . in the following fashion: 'That rule, as stated by us in *Strumsky*, provides that if the subject order or decision "substantially affects a fundamental vested right, the court, in determining under section 1094.5 of the Code of Civil Procedure whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence. If, on the other hand, the order or decision does not substantially affect a fundamental vested right, the trial court's inquiry will be limited to a determination of whether or not the findings are supported by substantial evidence in light of the whole record."' . . . [¶] . . . [¶] The concept of a 'fundamental' right has not been precisely defined. The *Bixby* court used language that '[i]n determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation.' [Citation.] . . . The *Bixby* court defined the 'vested' fundamental right in terms of a contrast between a right *possessed* and one that is merely *sought*: '[A]nd, if it is such a fundamental right, whether it is possessed by, and vested in, the individual or merely sought by him. In the latter case, since the administrative agency must engage in the delicate task of determining whether the individual qualifies for the sought right, the courts have deferred to the administrative expertise of the agency. If, however, the right has been acquired by the individual, and if the right is fundamental, the courts have held the loss of it is sufficiently vital to the individual to compel a full and independent review.' [Citation.] [¶] In *Anton*, the court applied the *Bixby-Strumsky* definitions and concluded that a physician's right to *renewal* of hospital and staff privileges which had been renewed annually for a number of years before, and which was now denied by a decision of the hospital's board of directors, was 'both fundamental and vested within the meaning of *Bixby* and *Strumsky*.' [Citation.] The *Anton* court thus continues the traditional distinction made between an

the trial court herein erred in applying the substantial evidence standard of review.

## II

## No Procedural Due Process Violations

■ We conclude that appellant's contentions with respect to alleged procedural due process violations by Council are without merit, and, in any event, are unsupported by any pertinent citation of authority. (*Eureka Teachers Assn.* v. *Board of Education* (1988) 199 Cal.App.3d 353, 369 [244 Cal.Rptr. 240].) Appellant contends that "The Council abused its discretion by not notifying petitioner that it would be permitted one and only one response to the evaluation report, and that the future of the institution stood or fell on that one document. Such an unannounced secret policy is violative of due process requirements of notice, arbitrary and is a prejudicial abuse of discretion." However, appellant fails to establish that the prehearing procedures employed by Council are, or were, secret; that it had no opportunity to respond further after it submitted its 561-page report in May 1994 in response to the visiting committee report; and that "the future of the institution stood or fell on that one document." It is clear from our record that an administrative hearing was held over the course of several days in May 1995, and that appellant was able to call witnesses and admit other evidence in addition to the materials submitted in May 1994. Thus, to the extent appellant implies that the final decision was made by Council in July 1994, and that appellant had no opportunity thereafter to address issues, we conclude that our record belies the claim. Further, as pointed out by respondents, this issue was not explicitly raised below and should be deemed waived.

Appellant contends that "The Council erroneously interpreted the statutes and regulations as not permitting the institution to make any corrections to bring it into compliance once it has made its response to the staff authored visiting committee evaluation report." This argument, also unsupported by any citation to authority, or even to a citation of the statutes and regulations allegedly misinterpreted by Council, simply seems to be a reiteration of the previous contention. This argument is without merit as it is unsupported by any authority and so vague that we cannot ascertain the statutes and regulations allegedly misinterpreted by Council.

application for a license (a 'privilege') and the revocation of a license (a 'vested right')." (*Coldwell Banker & Co.* v. *Department of Insurance* (1980) 102 Cal.App.3d 381, 406-407 [162 Cal.Rptr. 487].)

Similarly without citing any pertinent authority, appellant contends that it "was deprived of due process rights to adequate notice by being required to bring its operations into compliance with emergency regulations proposed just 90 days prior to the visiting committee site review and during the time that the emergency regulations were undergoing the public comment and amendment process." This argument is premised on several factual assumptions which are not supported by the record. The Act became effective on January 1, 1991; the Act sets out, in sections 94310 and 94311, among others, certain requirements and procedures regarding the application for approval process; the first set of emergency regulations promulgated under the Act were effective as early as August 1992, and appellant's site visit was not until February and March 1994. Accordingly, we cannot conclude on this record that appellant had only 90 days to bring itself into compliance.

III

EMERGENCY REGULATIONS

Appellant articulates the following two contentions pertaining to the emergency regulations: (1) Council abused its discretion in the use of the emergency regulation process by stretching an original one-hundred-eighty-day declaration of emergency from March 12, 1992, through April 19, 1994, when the permanent regulations were approved; and (2) the trial court erred in ruling that the emergency regulations were in effect from August 17, 1992, until the time in April 1994, when permanent regulations were approved, in that there were two periods of time—from December 16, 1992, to April 13, 1993, and from August 11, 1993, to November 17, 1993—in which there were no emergency regulations in effect.

Appellant cites no legal authority to support the claim that Council could not submit or resubmit three sets of emergency regulations. Accordingly, appellant has not met its burden of establishing any procedural impropriety in the process in which the emergency regulations were promulgated.

As to the alleged gaps in time when no regulations were in effect, even if we assume that the trial court's ruling was incorrect, we fail to see any relevance of this issue to our review of the findings and decision of Council. Appellant fails to cite to any applicable authority to establish the existence of the alleged gaps or the legal significance, if any, of such alleged gaps. Further, appellant fails to establish that it relied upon the alleged absence of regulations during the two time periods, or that it was prejudiced or misled in any way in conducting its business or in submitting its application for approval in July 1993. In fact, appellant fails to identify any

action it took, or any action Council took in relation to its application, during the two time periods at issue. University having failed to provide support for its contentions with pertinent legal authority, we find them to be without merit.[5]

## IV

### Visiting Committee Report

As we interpret appellant's contention with respect to the visiting committee report, appellant maintains that both Council and the trial court misinterpreted section 94310, subdivision (d)(1), as permitting Council, rather than the visiting committee, to draft the visiting committee report using the visiting committee's data. Appellant also claims that title 5, section 71465 of the regulations is inconsistent with the provisions of the statute because the regulation dispenses with the requirement that the visiting committee make quality improvement recommendations unless the council determines to grant an approval to operate.

Subdivision (d)(1) of section 94310 provides in pertinent part: "The council shall conduct a qualitative review and assessment of the institution and all programs offered, including the items listed in subdivision (b), through a comprehensive onsite review process, performed by a qualified visiting committee impaneled by the council for that purpose. . . . The visiting committee shall be impaneled by the council within 90 days of the date of the receipt of a completed application and shall be composed of educators, and other individuals with expertise in the areas listed in subdivision (b), from degree-granting institutions legally operating within the

---

[5] We do not imply that respondents' contrary argument with respect to the effective dates of the three sets of emergency regulations is correct. On the instant record, we cannot determine whether or not there may have been two "gaps" when there may not have been emergency regulations in effect. The "History" annotation to many of the regulations in title 5 provides as follows: "1. New chapter 2 (articles 1-18, sections 71000 - 71930, nonconsecutive) filed 8-17-92 as an emergency; operative 8-17-92 (Register 92, No. 34). A Certificate of Compliance must be transmitted to OAL 12-15-92 or emergency language will be repealed by operation of law on the following day. [¶] 2. Certificate of Compliance as to 8-17-92 order transmitted to OAL on 2-3-93; disapproved by OAL on 3-24-93 (Register 93, No. 14). [¶] 3. New section refiled 4-12-93 as an emergency; operative 4-12-93 (Register 93, No. 16). A Certificate of Compliance must be transmitted to OAL 8-10-93 or emergency language will be repealed by operation of law on the following day. [¶] 4. Certificate of Compliance as to 4-12-93 order transmitted to OAL on 10-6-93; disapproval by OAL on 11-22-93 (Register 93, No. 49). [¶] 5. New chapter 2 and section refiled 11-17-93 as an emergency; operative 11-17-93 (Register 93, No. 47). A Certificate of Compliance must be transmitted to OAL by 5-16-94 or emergency language will be repealed by operation of law on the following day. [¶] 6. Certificate of Compliance as to 11-17-93 order transmitted to OAL with amendments 3-11-94 and filed 4-19-94 (Register 94, No. 16)."

state. Within 90 days of the receipt of the visiting committee's evaluation report and recommendations, or any reasonable extension of time not to exceed 90 days, the council shall take one of the following actions: [¶] . . . [¶] (C) The council may deny the application. . . . ."

Section 71460 of title 5 of the regulations provides in pertinent part that "The visiting committee shall cooperate with the Council staff liaison in the preparation of a written evaluation report as described in Section 71465." (Tit. 5, § 71460, subd. (c).) Section 71465 of title 5 provides in pertinent part: "(a) The visiting committee report shall contain all of the following: [¶] (1) The committee's findings regarding the institution's compliance with the Act and this chapter and facts supporting those findings. [¶] (2) The committee's assessment of the quality of each educational program offered by the institution and facts supporting the assessment. [¶] (3) The committee's assessment of the quality of the institution as a whole and facts supporting the assessment. [¶] (4) The committee's recommendations for quality improvement based on its findings and assessment in the event the Council determines to grant an approval to operate. [¶] . . . [¶] (c) Except as provided in subdivision (d), the Council shall accept the visiting committee's report as its basis for taking appropriate action. [¶] (d) The council shall not be bound by any of the following: [¶] (1) Any facts adduced by the visiting committee that are based on inaccurate or unreliable evidence or that are inconsistent with other facts found by the Council. [¶] (2) The findings or assessment made by the visiting committee if the findings or assessments are not supported by the facts or the facts support different findings or assessments that may be reasonably made by the Council. [¶] (3) The visiting committee's recommendations. Any actions taken which do not follow these recommendations must have some reasonable basis in fact or law."

■ Contrary to appellant's arguments, we find no language in section 94310, subdivision (d)(1), which requires the evaluation report of the onsite review process to be drafted by the visiting committee itself—a group of eight individuals with different areas of academic expertise, which areas together match the programs offered by University—as opposed to a Council staff liaison person. In any event, we note that the testimony at the trial established that all of the individuals on the visiting committee signed off on a draft visiting committee report, which was prepared by the Council staff liaison using the documents and notes provided by the individual visiting committee members. In any event, appellant does not claim that the findings of all members of the visiting committee were not reflected in the report, or that a visiting committee member would have made a recommendation different than those in the report.

With respect to the issue of whether Council interpreted the regulations to dispense with the requirement to provide recommendations in the report, we note that the visiting committee report contained quality improvement recommendations in the executive summary portion of the report, which contained numerous such recommendations, as well as additional areas of concern. Therefore, there is no evidence in our record that Council interpreted title 5, section 71465, subdivision (a)(4) of the regulations in the manner urged by appellant, which would be an absurd interpretation inasmuch as it would require an impossibility, i.e., that the report was required to contain such recommendations only in the event that Council, at some later time, decided to grant approval, which decision could not be known at the time of preparation of the visiting committee report. Clearly, the regulation reasonably cannot be construed in the manner urged by appellant. Rather, the regulation can only reasonably be interpreted to mean that the report was to contain recommendations for future improvements and changes which could be implemented in the event of approval, but which recommendations were to be set out in the report regardless of whether the application was subsequently approved or denied. We thus conclude that appellant fails to establish that title 5, section 71465 of the regulations is inconsistent with the provisions of section 94310, subdivision (d)(1).

V

SUFFICIENCY OF EVIDENCE

■ Appellant's remaining contentions are best characterized as challenges to the sufficiency of the evidence to support Council's final decision to deny it approval to operate.[6]

Appellant contends that "The Council committed error by receiving and considering additional evidence at its closed session [after rejecting the proposed decision of the ALJ] without notice to [appellant] and without affording [it] an opportunity to be heard." Appellant maintains that the Council decision relies upon documents in student files for students J.H. and G.C.B., whose files were admitted into evidence even though no testimony was received about those student files and appellant thus had no notice and opportunity to explain or otherwise address such files. Appellant states that "The initials of student[s] J.H. and G.C.B. do not appear either in the Second Statement of Issues . . . and the transcript of the seven day administrative hearing does not contain any mention of either students J.H. or G.C.B."

---

[6]Appellant does not challenge the implied premise of Council's findings that the pertinent time period under scrutiny for compliance was August 1992 to the time of the site review. Further, appellant does not claim that the findings are insufficient to support the decision denying its application.

Even though the instant record is voluminous, it is still no excuse for appellant to either misrepresent the record, or fail to notice that Dr. Philip Baslilin, one of the site reviewers, did testify as to students J.H. and G.C.B. Testimony about G.C.B. was quite extensive, and her initials appear on pages 97, 99, 100, 102, 116 of the transcript of the May 17, 1995, hearing. Appellant even cross-examined Dr. Baslilin about G.C.B. The testimony on student J.H. appears on pages 102 to 104 of the transcript of May 17, 1995.

Without merit also is appellant's final contention that "The trial court committed error in ruling that petitioner sustained its burden of proof at the administrative hearing. The evidence was to the contrary."[7] The relevancy of the issue as to the burden of proof is not explained; in any event, our task is only to review the administrative record for sufficiency of the evidence to support the agency decision. "On appeal, we review the administrative decision itself (not the decision of the trial court) to determine if it is supported by substantial evidence." (*Mohilef* v. *Janovici* (1996) 51 Cal.App.4th 267, 306 [58 Cal.Rptr.2d 721].)

In connection with Council's findings of lack of compliance with regulations pertaining to University's governance and administration, appellant raises the issue of student E.W., who resided in Japan and to whom University issued a degree in January 1994 containing its own logo even though E.W. was enrolled in "Kensington University Japan." Council's decision noted that University violated section 94330, subdivision (k) (*ante*, fn. 2), and title 5, section 71610, subdivision (d) of the regulations permitting Council to request University to provide information, documents, or other evidence which it deems necessary for the evaluation of the institution's application for approval to operate. Dr. Sundberg, the Council specialist assigned to review University's application, testified that even though Council requested documentation on the nature of University's affiliation with Japan, there was insufficient evidence that E.W.'s master thesis (in Japanese) was evaluated by competent University faculty. In its appellate brief, University argues, without citation to the record, that E.W. was treated in the same manner as other students, but our record is insufficient to

---

[7]Throughout its brief, University refers to itself as "petitioner" even though at the administrative hearing before the ALJ, the Executive Director of Council, Kenneth A. Miller, was the complainant. The trial court expressly found in its statement of decision that University "had the burden of proof at the administrative hearing to show that it was entitled to be approved to operate pursuant to Education Code section 94310 by a preponderance of the evidence and [it] failed to meet its burden of proof," and that the findings in the Council's decision "are supported by substantial evidence in light of the whole record." Accordingly, we deem appellant's brief to contain a clerical error and that what appellant means to assert is that the evidence is insufficient to support the Council decision. The arguments to support this point are factually oriented, and we proceed to address these arguments below.

indicate that any University faculty were involved in providing education to, or evaluation of, this student's work in any way because there was no evidence that University had any faculty proficient in the Japanese language. Accordingly, substantial evidence supports Council's findings regarding student E.W. and its concern that University was awarding degrees under the authority of California without following minimum standards of operation.

Appellant also contends that because E.W. enrolled on September 1, 1993, a time when there allegedly were no regulations in effect, this student should have been excluded from consideration. However, appellant fails to indicate that this issue was raised at the time of the administrative hearing, or before the trial court. Moreover, appellant fails to establish with any appropriate authority that there were no regulations in effect on September 1, 1993. Even if we assume, without deciding, that there were no regulations in effect on such a date, appellant fails to establish that it was not bound by the regulations at the time it granted E.W. a master's degree in January 1994. For all of the foregoing reasons, we conclude that appellant fails to show that Council's findings on the issues of its administration and governance were not supported by substantial evidence.

In the area of curriculum and instruction, appellant challenges Council's findings that it did not maintain a course outline for each course offered, and that the outlines were insufficient in failing to provide information on course objectives, learning outcomes, and method of student evaluation. Appellant notes that in its 561-page response to the visiting committee's report, it did show that it had changed the outline format, and that course outlines were "on file at the time of the site visit, which is what was required by law." However, testimony in our record reveals that at the time of the site visit, there were no course outlines for the mechanical engineering courses and the course outlines for environmental science were inadequate. Accordingly, appellant fails to establish that Council's findings with respect to course outlines were not supported by substantial evidence.

With respect to the findings of violations of the regulations pertaining to curriculum and instruction, appellant raises several factual points with respect to particular student files. However, even if appellant's particular evidentiary point is well taken, appellant still fails to establish that the findings are not supported by substantial evidence. For example, Council found that the level of quality and rigor of the business program was impossible to evaluate because there were no instructor comments on student work, no record of student-faculty contact as part of the doctoral program, and no specific documentation as to how transfer and experiential learning

credits were earned or what particular courses or activities were involved. Appellant charges that Council ignored the fact that the work of business doctoral student K.L. was indeed evaluated by faculty; however, K.L. was only one of three student files cited by Council in its findings as to the business program, and appellant fails to establish that the findings with respect to the two other students were insufficient to support Council's findings as to the business program.

With respect to the education and public administration programs, Council's findings cited to two students, R.B. and R.S. In both instances, Council found that the quality of the student work did not support the award of the degree. Appellant's arguments on appeal address other issues discussed at the hearing, but do not challenge the findings with respect to the quality of each students' work. Appellant's arguments, although lengthy and detailed, and possibly correct, fail to establish the findings are not supported by substantial evidence.

With respect to the degree program in environmental science, appellant charges the Council with misrepresenting the testimony as stating that such a program necessitates laboratory instruction, which is not required by University. Appellant also notes that after the site visit, it decided to phase out the environmental science program "because of Council's rigid stance." Appellant fails to note that its own witness, Dr. Clive Grafton, testified that environmental science could be taught in a correspondence-type setting "providing that a student had access to some other laboratory experience, either prior to or immediately following" such education, but that University did not require such laboratory experience. Accordingly, substantial evidence supported Council's reasonable inference that such laboratory experience was necessary. We also conclude that appellant fails to demonstrate that there is no substantial evidence to support Council's findings with respect to two other deficiencies in the engineering program: several advanced level mechanical engineering courses were actually basic level courses and should only be required at the undergraduate level, and that the courses do not include prerequisites to indicate the logical development of knowledge or expertise.

With respect to the psychology counseling program, appellant challenges the Council's findings by simply making different inferences from the evidence than the reasonable inferences made by Council and by affording less credibility to the site reviewer's conclusions than afforded by Council, because the site-reviewer came from a traditional educational program and not a correspondence school program. Appellant fails to show that Council's

findings with respect to this program were not supported by substantial evidence.

We also find without merit appellant's challenges to the sufficiency of the evidence to support findings pertaining to the qualifications and number of faculty, and pertaining to admissions standards. In many instances, appellant merely makes factual assertions that are not borne out by the record. For example, appellant asserts that Council could not rely on the file of student R.S. to show that the qualifications of faculty on University's dissertation committee violated the regulations because R.S. was enrolled prior to the enactment of the regulations in August 1992. However, the evidence established that R.S. enrolled in the doctorate program in education in November 1992 and was awarded a Ph.D. in April 1993. Appellant fails to establish that the regulations did not apply during the time R.S. was a doctoral student. For the most part, appellant points out changes, or proposed changes and corrections, that were made in its programs after the site visit. Those changes in no way challenge Council's findings pertaining to violations which existed at the time of University's application for approval and as found by the visiting committee in February and March 1994. Moreover, there was no evidence to establish that all of the changes to the various curricula and to the administration of University, as set out in University's response to the visiting committee report, were actually implemented, and when such changes were allegedly made. Although appellant devised a new form and procedure for awarding transfer credit and prior experiential learning credit, there is no evidence in our record documenting if and when such new forms were actually used and whether they resulted in compliance with the regulations governing award of transfer and experiential learning credits.

With respect to Council's citation of several student files illustrating the violations with respect to the award of transfer and experiential learning credits, appellant focuses on issues not pertinent to the reason the student file was cited by Council, or appellant simply makes inferences from the evidence different than the reasonable inferences made by Council. For example, Council noted that student A.W. was admitted into the bachelor's program in environmental science with some transfer units, but University did not document whether the units qualified for the general education requirements or any specific degree program. Appellant challenges the foregoing by noting that the number of transfer credits were "clearly shown on his Meadows College transcript which was in his folder," which does not respond to Council's point that it was impossible to determine how and in what manner appellant allocated those transfer credits to equivalent University courses or requirements.

Appellant also contends that several students mentioned by Council to support its findings with respect to admission standards violations were admitted to University during times when there were allegedly no regulations in effect. As set out above, appellant has failed to establish with any appropriate legal authority that there were gaps in time when no regulations were in effect. Even if there had been such gaps, section 94310, subdivision (a)(7), provides in pertinent part that "If the institution offers credit for prior experiential learning it may do so only after an evaluation by qualified faculty and only in disciplines within the institution's curricular offerings that are appropriate to the degree to be pursued." Dr. Lambert, University's vice-president of academic affairs, admitted at the hearing that he awarded experiential learning credits to a student admitted into its environmental science program even though he (Dr. Lambert) had no background in that academic area, possessing a Ph.D. in psychology counseling. Thus, even in the absence of regulations, substantial evidence supports the finding of violations as to admission standards set out in section 94310, subdivision (a)(7). Dr. Lambert even admitted at the hearing that "we were not aware that the current law existed, but we did exceed them [regulatory limits on number of experiential learning credits], and it was a bad admission in several cases."

Council based its finding of violations of scholastic regulations on several student files which revealed that Ph.D. degrees were awarded to students with less than three years of full-time graduate study or the equivalent in part-time study, and that the doctoral candidates did not undergo two formal evaluations by a doctoral committee as required by the regulations. Appellant contends that the students cited had the appropriate *number* of credits, but appellant fails to respond to the basis of the violation, or to establish that all of those credits were appropriate for graduate and doctoral level degrees. Appellant also claims that one of the two required formal reviews of doctoral candidates was performed at the time the students were admitted to the doctoral programs, but appellant fails to establish that an appropriate doctoral committee, as required by title 5, section 71885, performed that admissions review process.

Substantial evidence supports the Council finding that University violated title 5, section 71740 in failing to provide written documentation that students had access to library facilities (tit. 5, § 71740, subd. (a)) and that such resources were actually utilized by students as part of the curricula. (*Id.*, § 71740, subd. (d)(4).) Appellant's primary challenge to this finding is that after the site review, it developed a form for each student file validating the availability and use of library facilities. Thus, appellant impliedly admits

having violated the regulation prior to the site review; moreover, after the time of the site review, there was no evidence in our record that appellant actually used the forms and was in compliance with the regulation pertaining to library resources.

Substantial evidence also supports the findings of violations with respect to recordkeeping, enrollment agreements and refunds, although Council did find that University refunded more money to students than required by regulation, and our record establishes that after the time of the site review, appellant did change its procedures in these areas to bring it into compliance. However, most of appellant's arguments tacitly acknowledge that it was indeed in violation of the regulations in some respects from the time they were effective in August 1992, until after the time of the site visit in March 1994.

We conclude that appellant fails to establish that the findings set out in Council's decision were not supported by substantial evidence. Accordingly, the trial court properly denied appellant's supplemental petition for writ of mandate.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to costs on appeal.

Johnson, J., and Woods, J., concurred.

A petition for a rehearing was denied April 15, 1997.